# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 1:25-cv-00913-SKC-TPO

LEVENT TUNCEL, Individually and on Behalf of All Others Similarly Situated,

      Plaintiff,

      v.

THOMAS SANDGAARD, and
DANIEL MOORHEAD,

      Defendants

---

Civil Action No. 1:26-cv-00714-DDD-KAS

KENT BEIDEL, Individually and on Behalf of All Others Similarly Situated,

      Plaintiff,

      v.

THOMAS SANDGAARD,
ANNA LUCSOK,
DANIEL MOORHEAD,
BARRY D. MICHAELS,
MICHAEL CRESS, and
JOSHUA DISBROW,

      Defendants.

---

## LEAD PLAINTIFF'S REPLY IN SUPPORT OF HIS MOTION TO CONSOLIDATE RELATED ACTIONS AND TO VACATE THE APRIL 21, 2026 DEADLINE IN THE *BEIDEL* ACTION

---

Case No. 1:25-cv-00914-SKC-TPO  Document 25  filed 03/26/26  USDC Colorado  pg 2 of 12

# TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................................... 1

II.   THERE IS NO OPPOSITION TO TUNCEL'S MOTION ..................................... 2

     A.    No Interested Party Opposes Consolidation ............................................. 2

     B.    The April 21, 2026 Deadline In The *Beidel* Action Should Be Vacated ................. 4

         1.    Beidel Concedes That He Had Notice Of The *Tuncel* Action But Failed To Timely Move For Appointment As Lead Plaintiff ...................................... 4

         2.    Beidel Concedes That His Class Period Is Self-Servingly Manufactured .. 4

         3.    Beidel Concedes That Revisiting Tuncel's Appointment Could Jeopardize The Class's Interests .................................................................................. 5

III.  BEIDEL OFFERS NO BASIS TO DELAY ADJUDICATION OF THE MOTION .............. 5

IV.   CONCLUSION ...................................................................................................... 9

# TABLE OF AUTHORITIES

## CASES

*Breaux v. Am. Family Mut. Ins. Co.*,
    220 F.R.D. 366 (D. Colo. 2004) ............................................................................................ 1, 3

*Crookshanks v. Elixabeth School District*,
    2025 WL 1000774 (D. Colo. Apr. 3, 2025) ............................................................................ 4, 5

*Dube v. Signet Jewelers Ltd.*,
    2017 WL 1379385 (S.D.N.Y. Apr. 14, 2017) ........................................................................... 7

*Eaton v. Pacheco*,
    931 F.3d 1009 (10th Cir. 2019) ............................................................................................... 1

*Holland v. John Deere Co.*,
    1992 WL 247107 (W.D. Okla. July 29, 1992) ......................................................................... 3, 5

*In re Cyberonics Inc. Sec. Litig.*,
    468 F. Supp. 2d 936 (S.D. Tex. Nov. 28, 2006) ...................................................................... 7

*Kaplan v. S.A.C. Capital Advisors, L.P.*,
    947 F. Supp. 2d 366 (S.D.N.Y. May 24, 2013) ....................................................................... 7

*Tchrs.' Pension Plan Bd. v. Teva Pharm. Indus., Ltd.*,
    2020 WL 1181366 (D. Conn. Mar. 10, 2020) .......................................................................... 6

*Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*,
    2005 WL 1322721 (S.D.N.Y. Jun. 1, 2005) ............................................................................. 7

## RULES

Fed. R. Civ. P. 42(a) ....................................................................................................................... 1

## I.    INTRODUCTION

No interested party actually opposes consolidation.[1] Defendants "strongly support the proposed consolidation as being in the interests of fairness and judicial economy,"[2] and Beidel concedes that the two actions "arise from overlapping facts and legal theories," thereby admitting that the standard for consolidation under Fed. R. Civ. P. 42(a) has been met. ECF No. 49 ("Response") at 6. Indeed, Beidel – a shareholder who *is* included in the *Tuncel* Action and could have moved for lead plaintiff in that action but choose not to – does not address the actual arguments in the Motion. His silence constitutes waiver of any opposition to Tuncel's arguments. *See Eaton v. Pacheco*, 931 F.3d 1009, 1031 (10th Cir. 2019) (party's failure to respond constitutes waiver of opposition arguments that could have been, but were not, made).

Instead, Beidel responds that the Motion should be held "in abeyance pending development of a full record" so as not "to bypass the opportunity for all parties to be heard." Response at 1-2. This ignores that all parties "***have had a chance*** to acquiesce in or resist" the requested relief because any interested party could have filed a timely opposition by March 24, 2026. *See Breaux v. Am. Family Mut. Ins. Co.*, 220 F.R.D. 366, 368 (D. Colo. 2004) (Response at 6) (emphasis added).

Biedel feigns concern about whether Defendants had enough time to state their position on Motion, but he refused to meet and confer with them before Tuncel filed his Motion. *See* Tuncel's Exhibit 1 at 3, 6-7 (Beidel's counsel: "I am not having any call with defendants today.").

---

[1] All capitalized terms have the meaning set forth in the opening brief (ECF No. 43, the "Motion").

[2] ECF No. 50 at 1: *see also* ECF No. 51 (Defendant Sandgaard supporting consolidation "[f]or the reasons stated in Tuncel's motion and Defendant Daniel Moorhead's response (ECF No. 50)").

Regardless, Defendants not only "had a chance" to respond to the Motion, but they have responded and confirmed they support the motion. ECF No. 50 at 2 (because both actions allege "identical securities fraud claims arising from the same alleged course of conduct," defendants "strongly support[]" consolidation); ECF No. 51. And any of "the purchasers of millions of Zynex shares who are not included in the *Tuncel* Action" could have stepped forward over the past year. *See* Response at 1.

Beidel offers no legal or equitable basis to delay adjudication of the Motion until he files a **separate** motion nearly **a month from now** seeking **different relief**. Response at 2. Beidel impugns Tuncel for "deferr[ing] the filing of an amended complaint" while the Court was considering Tuncel's lead plaintiff motion, wholly ignoring that Beidel has needlessly delayed the *Tuncel* Action by filing a duplicative action after he sat idle for months. Meanwhile, Tuncel did not wait for the order on his lead plaintiff motion to protect the class's interests. *See* Motion at 11-12.

The Motion should be granted in its entirety.

## II. THERE IS NO OPPOSITION TO TUNCEL'S MOTION

### A. No Interested Party Opposes Consolidation

All timely responses state that the *Tuncel* and *Beidel* Actions involve "overlapping facts and legal theories." Response at 6; *see also* Motion at 5-6; ECF Nos. 50-51. Beidel concedes that both actions involve Exchange Act violations by Zynex's former officers and that Beidel's claims against certain directors "is based on the same allegedly wrongful course of conduct." Motion at 5; *see* Response at 6 (no opposing argument). As such, the cases should be consolidated.

Beidel does not argue that consolidated is inappropriate; he only claims that it is premature "given the parties' disagreement over the appropriate class period." Response at 6. But he concedes

2

that differences in class period do not preclude consolidation. Motion at 6; *see* Response at 6. He also concedes that local rules, federal procedural rules, and the PSLRA require prompt adjudication of consolidation motions. Motion at 5-6; *see* Response at 6. In fact, his only cited authority confirms that consolidation does not require identical parties, facts, and claims. *See Breaux*, 220 F.R.D. at 368 (actions that are not "related" under local rules may nevertheless be consolidated).

To be sure, the Court need not decide the "appropriate scope of any consolidated pleading" at this juncture. *Cf.* Response at 6. The appropriate class period to allege in the amended complaint is in the discretion of the lead plaintiff.[3] As Beidel concedes, "Tuncel may amend his complaint to include expanded claims." Response 7 n.4. Therefore, Beidel's half-hearted arguments (about the appropriate class period or purported statute of repose issues) do not preclude consolidation.[4] Thus, the actions should be consolidated.[5]

---

[3] Beidel incorrectly suggests the dispute concerns the start date for the class period. *Id.* at 6. In actuality, Tuncel's position is: "Even if the appropriate start for the class period is February 25, 2021 and even if the statute of repose has expired, consolidation of the cases would allow Tuncel to bring those claims in his forthcoming amended complaint." Tuncel's Exhibit 1 at 2.

[4] Beidel does not actually substantiate these arguments and only promises to "address [them]. . . in detail in his forthcoming lead plaintiff motion." *Id.* at 6. This refusal to articulate his position now constitutes waiver; a party cannot cite to an unfiled motion instead of actually putting forth argument in a timely response to a motion. *See Holland v. John Deere Co.*, 1992 WL 247107, at *1 (W.D. Okla. July 29, 1992) ("If the Court were to permit such an ungainly practice then what would develop would be the neverending motion [practice] which would impose an intolerable toll on the just, speedy, and inexpensive determination of actions before this Court.").

[5] Beidel's quibbles about compliance with local rules are baseless. *See* Response at 6 n.3. First, the clerk directed Tuncel to file his motion for consolidation only in the lowest-numbered case. But to address Beidel's unspecified concern, Tuncel will endeavor to file in the *Beidel* Action the entire briefing for this Motion. Second, as a practical matter, consolidation and vacating the April 21, 2026 deadline are "complementary" relief that "shall be included in a single motion." Civ. Practice Standard 7.1(A)(a)(5).

**B.      The April 21, 2026 Deadline In The *Beidel* Action Should Be Vacated**

As pointed out in Tuncel's Motion, the April 21, 2026 deadline in the *Beidel* Action should be vacated because the lead plaintiff process set forth in the PSLRA has already been followed, resulting in Tuncel's appointment as lead plaintiff. Motion at 7-12. Beidel does not respond to Tuncel's arguments, thereby waiving his opposition to the Motion on this issue.

**1.      Beidel Concedes That He Had Notice Of The *Tuncel* Action But Failed To Timely Move For Appointment As Lead Plaintiff**

Tuncel argued in the Motion that: (i) Beidel had adequate notice of the pendency of the *Tuncel* Action and the deadline to seek appointment as lead plaintiff in that action; (ii) Beidel is a member of the class alleged in the *Tuncel* Complaint; (iii) Beidel had the opportunity to seek appointment as lead plaintiff in the *Tuncel* Action; (iv) by failing to file a timely motion in the *Tuncel* Action, Beidel did not diligently step forward to act on behalf of the class he now seeks to represent; and (v) Beidel cannot cure his neglect by commencing a new related action after Tuncel was already appointed as lead plaintiff. Motion at 7-9. Beidel failed to respond to any of these arguments beyond claiming that "Tuncel's arguments are premature." Response at 7. Beidel's failure to respond to these arguments constitute waiver. *See Crookshanks v. Elixabeth School District*, 2025 WL 1000774, at *5 (D. Colo. Apr. 3, 2025) ("Courts in this Circuit routinely deem an issue waived when a party fails to respond to a movant's substantive argument.").

**2.      Beidel Concedes That His Class Period Is Self-Servingly Manufactured**

Tuncel argued in his Motion that: (i) Beidel's expanded class period, alleging that misleading statements were made on December 15, 2025, was manufactured to respond to Tuncel's arguments that Beidel has not been diligent; (ii) even if December 15, 2025 is the appropriate date to end the class period, Tuncel can plead the requisite facts in his amended complaint; and (iii) the

4

events that post-date the *Tuncel* Complaint are further revelations of the alleged fraudulent billing practices. Motion 9-11. Beidel merely responds that these arguments are "unavailing" without elaborating, *see* Response at 9 n.6, thereby waiving any opposition he may claim to make in a future motion seeking different relief. *See Crookshanks*, 2025 WL 1000774, at *5; *Holland*, 1992 WL 247107, at *1.

### 3. Beidel Concedes That Revisiting Tuncel's Appointment Could Jeopardize The Class's Interests

Tuncel argued in the Motion that: (i) Tuncel acted diligently in protecting the class's interests while his lead plaintiff motion was pending, including by retaining investigators to interview former employees with relevant knowledge and taking affirmative steps in Zynex's bankruptcy proceedings such as filing a proof of claim; (ii) Beidel did not take any such action; and (iii) if Tuncel's appointment as lead plaintiff were vacated, the class's interests could be jeopardized. Motion at 11-12. Again, Beidel does not respond at all to these arguments, conceding that Tuncel was actively protected the class's interests while Beidel sat on his hands. *See Crookshanks*, 2025 WL 1000774, at *5.

### III. BEIDEL OFFERS NO BASIS TO DELAY ADJUDICATION OF THE MOTION

Beidel asks the Court to defer consideration of the Motion until after lead plaintiff motions in the *Beidel* Action are filed on or before April 21, 2026. Setting aside that Tuncel has already filed his Motion precisely to request the Court's ruling **before** those motions are filed in the *Beidel* Action, Beidel's arguments are not persuasive.

*First*, the *Beidel* Action has not "materially altered" the allegations in the *Tuncel* Action. Response at 7-8. Beidel claims that his action is for "an entirely different time period, covering different instances of wrongdoing (and encapsulating different investors)." *Id.* at 9. It is readily

apparent that the class period in the *Tuncel* Complaint is subsumed within the class period in the *Beidel* Complaint. *Compare* ECF No. 1 at ¶1, *with* Tuncel's Exhibit 6 at ¶1. Indeed, Beidel acknowledges that the two actions concern "overlapping facts and legal theories" and that the "new" claims in his complaint are based on the same wrongful course of conduct pled by Tuncel. *See* Sec. II.A., *supra*. Defendants agree that the two actions raise "identical securities fraud claims arising from the same alleged course of conduct." ECF Nos. 50-51.

*Second*, the events that occurred after Tuncel filed his initial complaint do not justify a new lead plaintiff process. Response at 9. Beidel claims that "the facts have evolved to require a much larger class period, important new defendants, and substantially expanded facts and claims." Response at 8. Beidel does not distinguish the instant case from the decisions cited in the Motion holding that reopening the lead plaintiff appointment process is not warranted where the new allegations or claims are further revelations of the same course of conduct. *See* Motion at 11. Beidel's own authority agrees that republication of PSLRA notice is not required where, as here, the first case "anticipated further developments with respect to the [regulator's] investigation." *Ont. Tchrs.' Pension Plan Bd. v. Teva Pharm. Indus., Ltd.*, 2020 WL 1181366, at *11-12 (D. Conn. Mar. 10, 2020) (also reasoning that new "state common law claims . . . depend on the same facts" as the federal securities claims). Here, Tricare's investigation into Zynex's overbilling was pending when Tuncel filed suit, and the "the Allstate litigation, the July 2025 10-Q, and the federal criminal indictment" flow from the same alleged misconduct. *See* Motion at 3-5; Response at 10; ECF No. 50 at 2.[6]

---

[6] Beidel argues that his share repurchase claims "are unrelated to the claims asserted in the *Tuncel* Action." Response at 11. That plainly conflicts with Beidel's own allegations. Tuncel's Exhibit 6

Beidel wrongly argues that "the instant situation is more analogous to *Dube" v. Signet Jewelers Ltd.*, 2017 WL 1379385 (S.D.N.Y. Apr. 14, 2017). Response at 11. There, the original complaint concerned the company's handling of customers' jewelry, the first amended complaint added a theory about the quality of the company's credit portfolio, and the second amended complaint abandoned the customers' jewelry theory and added a theory about persuasive sexual harassment. *Signet*, 2017 WL 1379385, at *2. Clearly, claims about a company's credit portfolio and persuasive sexual harassment are based on different facts and theories. As such, the court found that the second amended complaint alleged "two categorically different theories of securities fraud" than the original complaint, republication was warranted. *Id.* Here, in contrast, both actions center on Zynex's fraudulent billing practices and associated overstatement of revenues. ECF No. 1, ¶¶7, 14-16; Tuncel's Exhibit 6, ¶¶18, 25-31. Beidel's other authorities are similarly distinguishable.[7]

*Third*, Beidel's statute of repose argument rests on the assumption that the class period must start on February 25, 2021. *See* Response at 10-11. Though his Response does not articulate the basis for this assumption, Beidel suggests that his "new claims" are based on "the Allstate litigation, the July 2025 10-Q, and the federal criminal indictment." *Id.* at 11. As an initial matter,

---

at ¶¶18, 46 (alleging that the repurchases were "designed" to "fuel" the "rampant fraud and overbilling").

[7] Beidel's authorities found that investors would have disregarded the original notice, but here Beidel concedes that he had adequate notice of the allegations (Sec. II.B.1). *See Kaplan v. S.A.C. Capital Advisors, L.P.*, 947 F. Supp. 2d 366, 367 (S.D.N.Y. May 24, 2013) (original class excluded investors who traded contemporaneously with and opposite to the named defendants); *In re Cyberonics Inc. Sec. Litig.*, 468 F. Supp. 2d 936, 939-40 (S.D. Tex. Nov. 28, 2006) (large investors were excluded from the original class); *Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*, 2005 WL 1322721, at *2 (S.D.N.Y. Jun. 1, 2005) (original class excluded Series-C securities).

Allstate's complaint, which partly relies on Tuncel's allegations, alleges examples of Zynex's fraudulent overbilling after August 2021. Tuncel's Exhibit 11 at ¶¶137-140. That does not show that Zynex's financial statements issued six months prior were false or misleading. *See id.* Even if it did, that would rely wholly on unverified, disputed allegations. By that logic, the Travelers' action (filed in August 2023) would be sufficient to plead that Zynex's financial statements dating back to November 2018 are false and misleading. *See* Tuncel's Exhibit 6 at ¶¶ 43-44 (alleging that Travelers' allegations "further echo" the later-filed Allstate action). That is, the class period should start *even earlier* than February 25, 2021, and Beidel has done nothing to preserve *those* claims. But Beidel does not even bother to mention the Travelers' action in his Response because it does not fit his pretextual and lawyer-driven argument about the class period. In sum, Beidel's proffered February 25, 2021 date is arbitrary and not supported by the facts.

*Finally*, the fact that Tuncel has not *yet* amended his complaint is irrelevant. Beidel both faults Tuncel for filing his complaint too quickly and for not amending his complaint quickly enough. *Id.* at 3, 9 (baselessly suggesting that Tuncel could have pled a longer class period in his initial complaint in March 2025 and incorrectly claiming that "Tuncel chose not to amend" his complaint).[8] Beidel cannot have it both ways. Tellingly, Beidel ignores that Tuncel would already have amended his complaint but-for the commencement of the *Beidel* Action.

None of Beidel's arguments explain why the Court must wait until April 21, 2026 to adjudicate the Motion. Beidel claims that he himself must be afforded that time to be heard. But he has already responded to the Motion, and none of Beidel's arguments are availing.

---

[8] Beidel's argument also ignores that the Court had a scheduling order for filing the complaint after the appointment of a lead plaintiff. *See* ECF No. 10.

## IV.    CONCLUSION

For the foregoing reasons, Tuncel respectfully request that the Court grant his Motion in its entirety and enter an Order (a) consolidating the *Tuncel* and *Beidel* Actions; (b) vacating the April 21, 2026 deadline to seek appointment as lead plaintiff and approval of counsel; and (c) granting such other relief as the Court may deem just and proper, including denying as moot any lead plaintiff motions that are filed in the *Beidel* Action.

Dated: March 25, 2026

*/s/ Pavithra Rajesh*
**GLANCY PRONGAY WOLKE & ROTTER LLP**
Robert V. Prongay
Casey E. Sadler
Pavithra Rajesh
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160

*Counsel for Lead Plaintiff Levent Tuncel and Lead Counsel for the Putative Class*

## AI CERTIFICATION

I hereby certify that no portion of this filing was drafted by AI.

*/s/ Pavithra Rajesh*
Pavithra Rajesh

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing document and accompanying declaration, exhibits, and proposed order were filed with this Court on March 25, 2026 through the CM/ECF system and will be sent electronically to all registered participants as identified on the Notice of Electronic Filing.

/s/ Pavithra Rajesh
Pavithra Rajesh

TUNCEL'S
EXHIBIT 11

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| ALLSTATE INSURANCE COMPANY, ALLSTATE INDEMNITY COMPANY, ALLSTATE COUNTY MUTUAL INSURANCE COMPANY, ALLSTATE FIRE AND CASUALTY INSURANCE COMPANY, ALLSTATE NEW JERSEY INSURANCE COMPANY, ALLSTATE NEW JERSEY PROPERTY AND CASUALTY INSURANCE COMPANY, ALLSTATE NORTH AMERICAN INSURANCE COMPANY, ALLSTATE NORTHBROOK INDEMNITY COMPANY, AND ALLSTATE PROPERTY AND CASUALTY INSURANCE COMPANY, <br><br> Plaintiffs, <br><br> vs. <br><br> THOMAS SANDGAARD, DANIEL MOORHEAD, ANNA LUCSOK, ZYNEX, INC., AND ZYNEX MEDICAL, INC., <br><br> Defendants. | C.A. No. |

**COMPLAINT AND DEMAND FOR JURY TRIAL**

The Plaintiffs, Allstate Insurance Company, Allstate Indemnity Company, Allstate County Mutual Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate New Jersey Insurance Company, Allstate New Jersey Property and Casualty Insurance Company, Allstate North American Insurance Company, Allstate Northbrook Indemnity Company, and Allstate Property and Casualty Insurance Company (hereinafter collectively referred to as "Allstate" and/or "Plaintiffs"), by their attorneys, King, Tilden, McEttrick & Brink, P.C., hereby allege as follows:

## I.    INTRODUCTION

1.    Thomas Sandgaard ("Sandgaard"), Daniel Moorhead ("Moorhead"), and Anna Lucsok ("Lucsok") (hereinafter referred to collectively as the "individual Defendants") by and through the ownership, operation and control of the businesses, Zynex, Inc. ("Zynex"), and Zynex

- 1 -

Medical, Inc. ("Zynex Medical"),[1] devised and executed a scheme to defraud Allstate by submitting and causing to be submitted[2] false and fraudulent records, and bills for the sale and distribution of durable medical equipment ("DME") and supplies through the U.S. Mail seeking to collect payment from insurance claims in 47 states[3] and the District of Columbia (hereinafter referred to as the "Zynex scheme").

2.      The Defendants also mailed false records and bills, or caused false records and bills to be mailed, through the U.S. Mail to Allstate claimants and/or their personal injury attorneys who, in turn, mailed the documents, through the U.S. Mail, to Allstate in support of the Allstate claimants' medical expense and bodily-injury claims.

3.      The Defendants further engaged in fraudulent practices by mailing DME and replenishment supplies through the U.S. Mail to patients when those items were not medically necessary and had not been requested by the patients, nor prescribed by their healthcare providers.

4.      The highest concentration of the fraudulent claims submitted to Allstate claimants by the Defendants originated from New York.

5.      The Zynex scheme, as described with particularity herein, was intentionally initiated, promoted, financed, operated and maintained by the Defendants.

6.      The Defendants targeted the insurance benefits available to motor vehicle accident victims (also referred to herein as "Allstate claimants"), nationally, to ensure a steady stream of revenue to support their fraudulent scheme.

---

[1] Sandgaard, Moorhead, and Lucsok shall be referred to collectively as the "individual Defendants." Zynex and Zynex Medical shall be referred to collectively as the "corporate Defendants." The individual Defendants and the corporate Defendants shall be referred to collectively as the "Defendants."

[2] The phrase "submitted or caused to be submitted" will be shortened to "submitted" throughout this Complaint.

[3] Alabama, Alaska, Arizona, Arkansas, California, Colorado, Connecticut, Delaware, Florida, Georgia, Hawaii, Idaho, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, Ohio, Oklahoma, Oregon, Pennsylvania, South Carolina, South Dakota, Tennessee, Texas, Utah, Vermont, Virginia, Washington, West Virginia, and Wisconsin.

7.  The Defendants abused Allstate's claimants' insurance coverage by billing for DME that the Defendants had no legal right to collect.

8.  The Defendants knew their scheme was unfair and deceptive to payors of healthcare services, such as Allstate, and knew that Allstate would rely on their fraudulent records to issue payment for the fraudulent medical products on behalf of Allstate claimants.

9.  The Defendants' defrauded Allstate by:

   a. Billing for DME products based upon false representations to Allstate that the DME was prescribed by a licensed and/or qualified healthcare professional;

   b. Billing for replenishing DME supplies that were not prescribed by a physician or other qualified healthcare provider, and therefore medically unnecessary;

   c. Unilaterally making the medical decision to replenish Allstate claimants' with a lifetime supply of DME supplies when the Defendants were not licensed medical practitioners;

   d. Billing Allstate claimants for medically unnecessary DME pursuant to a predetermined treatment protocol;

   e. Billing for DME supplies that were not provided to Allstate claimants as represented, if at all;

   f. Billing grossly excessive fees for DME and supplies; and

   g. Billing for unbundled DME supplies.

10.  The Defendants' fraudulent billing practices have recently attracted the attention of other insurers, resulting in a class action lawsuit filed on behalf of Zynex's shareholders ("class action").

11.  On June 4, 2024, Lizzy Lawrence from the STAT healthcare journal published an article entitled, "How a device maker inundated pain patients with unwanted batteries and surprise

bills."[4] The article described Zynex as engaging in an "oversupplying scheme" by sending copious monthly supplies such as electrodes and batteries to "bill insurers for thousands of dollars more than it otherwise could." As a result, insurers were "kicking the company out of network." Zynex's stock price fell by five percent the same day the article was published.

12. On March 11, 2025, Zynex reported its financial results for the fourth quarter and full year for the fiscal year, which ended on December 31, 2024, to the Securities and Exchange Commission ("SEC"). In these reports, Zynex revealed a revenue "shortfall" in the fourth quarter "due to slower than normal payments from certain payers." Zynex also reported that Tricare, the healthcare program for active duty service members, retirees, and their dependents that accounts for approximately 20-25% of Zynex's annual revenue, had "temporarily suspended payments." Following this news, Zynex's stock price fell 51.3%.

13. On March 20, 2025, the class action Complaint was filed in the United States District Court for the District of Colorado on behalf of persons and/or entities that purchased or acquired Zynex securities between March 13, 2023 and March 11, 2025, naming Zynex, Inc., CEO Thomas Sandgaard, and CFO Daniel Moorhead as Defendants ("class-action Defendants").

14. The class action Complaint, citing both the STAT article and March 11, 2025 financial reports, alleged that the "Defendants failed to disclose to investors: (1) that Zynex shipped products, including electrodes, in excess of need; (2) that, as a result of this practice, the Company inflated its revenue; (3) that the Company's practice of filing false claims drew scrutiny from insurers, including Tricare; (4) that, as a result, it was reasonably likely that Zynex would face adverse consequences, including removal from insurer networks and penalties from the

---

[4] Lawrence, Lizzy. "How a Device Maker Inundated Pain Patients with Unwanted Batteries and Surprise Bills." STAT News, 2024, https://www.statnews.com/2024/06/04/zynex-medical-pain-patient-tens-unit-batteries-electrodes-bills/.

federal government; and (5) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis."

15.    Count one of the class action Complaint alleged that the class action Defendants each violated Section 10(b) and Rule 10b-5 of The Exchange Act when they "(i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business, which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices."

16.    Count two of the class action Complaint alleged that Thomas Sandgaard and Daniel Moorhead, "[b]y virtue of their high-level positions and their ownership and contractual rights, participation in, and/or awareness of the Company's operations and intimate knowledge of the false financial statements filed by the Company with the SEC… had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements, which Plaintiff contends are false and misleading" in violation of Section 20(a) of The Exchange Act.

17.    This class action, captioned *Tuncel v. Zynex, Inc., et al*, No. 1:25-cv-00913, remains ongoing.

18.    As with the insurers referenced in the *Tuncel* case, the Defendants defrauded Allstate by using the same fraudulent billing practices and oversupplying schemes previously described.

19.     As set out in the second count of the *Tuncel* case, Sandgaard and Moorhead had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of Zynex and Zynex Medical, including the dissemination of false statements to Allstate.

20.     The individual Defendants are responsible for this fraudulent activity, as they had the power to influence and control, and did influence and control, the corporate Defendants' decision to commit this massive fraud against Allstate.

21.     The Defendants knew that Allstate would rely on the representations made in the corporate Defendants' records and bills when determining whether to pay medical expenses and bodily-injury claims.

22.     Allstate justifiably and detrimentally relied upon the Defendants' false documentation submitted (in all claims) in evaluating payments of the insurance claims.

23.     In all cases, Allstate was unaware of the Defendants' misrepresentations and omissions of material fact in their records and bills concerning the legitimacy of the DME and supplies purportedly provided to the Allstate claimants.

24.     The Defendants intended to siphon payments from the proceeds of the insurance monies paid by Allstate to resolve the Allstate claimants' medical expense and bodily-injury claims.

25.     Allstate made payments to the Defendants, and Allstate was also caused to make payments in connection with bodily-injury claims presented by Allstate claimants, which collectively total more than $3,008,633.72 (the exact amount to be determined at trial).

26.     Allstate paid these claims in direct reliance on the false records and bills created, and submitted by the Defendants.

27.    Allstate payments were the proximate cause of the Defendants' scheme to defraud through a pattern of racketeering activity.

28.    By its pleading, Allstate brings this action against the Defendants seeking damages for violations of the federal Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §1962; the Colorado Organized Crime Control Act ("COCCA"), C.R.S. § 18-17-101 *et seq.*; and under New York state laws including common law fraud, misrepresentation, and unjust enrichment.

29.    Allstate also seeks an order declaring that Allstate has no obligation to pay the Defendants for any of the services at issue in this Complaint.

30.    Allstate also seeks an award of (a) double damages, treble damages, and punitive damages as authorized by law, (b) statutory interest, (c) costs, and (d) attorneys' fees.

## II.    THE PARTIES

### A.    PLAINTIFFS

31.    Allstate Insurance Company, Allstate Indemnity Company, Allstate Fire and Casualty Insurance Company, Allstate New Jersey Insurance Company, Allstate North American Insurance Company, Allstate Northbrook Indemnity Company, and Allstate Property and Casualty Insurance Company are corporations duly organized and existing under the laws of the State of Illinois, having their respective principal places of business in Northbrook, Illinois.

32.    Allstate County Mutual Insurance Company is a corporation duly organized and existing under the laws of the State of Texas, having their respective principal place of business in Irving, Texas.

33.    Allstate New Jersey Property and Casualty Insurance Company is a corporation duly organized and existing under the laws of the State of New Jersey, having their respective principal place of business in Bridgewater, New Jersey.

34.    At all times relevant to the allegations contained in this Complaint, Allstate Insurance Company, Allstate Indemnity Company, Allstate County Mutual Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate New Jersey Insurance Company, Allstate New Jersey Property and Casualty Insurance Company,  Allstate North American Insurance Company, Allstate Northbrook Indemnity Company, and Allstate Property and Casualty Insurance Company were each authorized to conduct business in the states that they received billing from Zynex Medical.

### B.    DEFENDANTS

#### 1.    Thomas Sandgaard

35.    Sandgaard resides in and is a citizen of the State of Colorado.

36.    Sandgaard is the beneficial owner of approximately 50% of Zynex's outstanding stock.

37.    Sandgaard is not a licensed healthcare provider.

38.    Sandgaard participated in the operation and management of the corporate Defendants during the relevant period.

39.    Due to his ownership and/or control over Zynex and Zynex Medical, Sandgaard is responsible for the unlawful, medically unnecessary, fraudulent, and excessively charged DME and supplies billed by Zynex Medical in connection with Allstate claimants.

- 8 -

### 2. Daniel Moorhead

40. Moorhead resides in and is a citizen of the State of Colorado.

41. Moorhead has been the CFO of Zynex since June of 2017.

42. Moorhead is not a licensed healthcare provider.

43. Moorhead is a Certified Public Accountant who is responsible for all finance and accounting functions of the corporate Defendants, including internal policies geared toward generating sales for DME supplies that were not medically necessary.

44. Due to his control over the corporate Defendants, Zynex and Zynex Medical, Moorhead is responsible for the unlawful, medically unnecessary, fraudulent, and excessively charged DME and supplies billed by Zynex Medical in connection with Allstate claimants.

### 3. Anna Lucsok

45. Lucsok resides in and is a citizen of Colorado.

46. Lucsok has been the Chief Operating Officer of Zynex since January of 2021.

47. Lucsok is not a licensed healthcare provider.

48. Lucsok began working for the corporate Defendants in 2018, serving as Billing Manager and subsequently as the Vice President of Reimbursement and Sales Operations for Zynex Medical. Lucsok was directly responsible for both the fraudulent sale of DME and supplies and the subsequent false billing practices associated with it.

49. Furthermore, Lucsok's intimate knowledge of the fraud is demonstrated by her direct participation in collecting the illicit gains from insurers since 2018. In her roles as Billing Manager and then Vice President of Reimbursement and Sales Operations, she was precisely positioned to understand and execute the collection of these ill-gotten sums, directly profiting from and perpetuating the very fraud alleged.

50.     Sandgaard has stated that Lucsok was "instrumental in transforming [Zynex Medical's] reimbursement and sales operations, which are the backbone of the [c]ompany." Furthermore, Lucsok's name appears as one of the "Agents, Managing Employees & Those with a Control Interest" in supplemental documentation submitted on September 14, 2021 as part of Zynex Medical's application for reinstatement as a participating DME provider in the New York Medicaid Program.

51.     Lucsok participated in the operation and management of Zynex and Zynex Medical during the relevant period.

52.     Due to her control over Zynex and Zynex Medical, Lucsok is responsible for the unlawful, medically unnecessary, fraudulent, and excessively charged DME and supplies billed by Zynex Medical in connection with Allstate claimants.

**4.     Zynex, Inc.**

53.     Zynex is a corporation incorporated under the laws of Nevada. It is a medical device and supplies company.

54.     Zynex's principal place of business is 9655 Maroon Circle in Englewood, CO.

55.     Zynex is publicly traded under the ticker symbol "ZYXI."

56.     Zynex is the parent company of subsidiaries including Defendant, Zynex Medical (a medical device manufacturer that produces and markets electrotherapy devices at issue in the case), for use in pain management and physical rehabilitation.

57.     According to Zynex's 2024 SEC 10-K Annual Report, its net revenue in 2024 was $192,354,000. 69% of Zynex's net revenue in 2024 came from the sale of supplies, while its medical devices accounted for only 31% of its revenue.

58.     Zynex is an enterprise whose activities affect interstate commerce.

- 10 -

59.    Sandgaard, Moorhead, and Lucsok, and Zynex Medical participated in the operation and management of the Zynex enterprise during the relevant time period and are therefore responsible for the fraudulent DME, and replenishment supplies billed in connection with the Allstate claimants at issue in this Complaint.

### 5.    Zynex Medical, Inc.

60.    Zynex Medical is organized as a corporation under Colorado law.

61.    Zynex Medical's principal place of business is 9655 Maroon Circle in Englewood, CO.

62.    Zynex Medical is a wholly-owned subsidiary of Zynex.

63.    Zynex Medical does business worldwide. It specializes in manufacturing and marketing DME and accessories for in-home use, as well as selling consumable supplies for its products, such as electrodes and batteries.

64.    Zynex Medical is an enterprise whose activities affect interstate commerce.

65.    Sandgaard, Moorhead, Lucsok, and Zynex participated in the operation and management of the Zynex Medical enterprise during the relevant time period and are therefore responsible for the fraudulent DME, and replenishment supplies billed in connection with the claimants at issue in this Complaint.

### III.    JURISDICTION AND VENUE

66.    Subject matter jurisdiction over this action is conferred upon this Court by 28 U.S.C. §§ 1331 and 1332.

67.    Supplemental jurisdiction over the Plaintiffs' state law claims is proper pursuant to 28 U.S.C. § 1367.

68.     Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) whereas the corporate Defendants conducted business in the State of New York by operating as a DME provider and delivering, or purporting to deliver, DME to patients residing in the State of New York.

69.     On or about May 10, 2011, the corporate Defendants received authority to do business in the State of New York. The corporate Defendants are currently an active foreign corporation in the State of New York.

70.     Moreover, on or about September 14, 2012, Zynex Medical, which is wholly owned and controlled by Zynex, became enrolled as a participating provider in the New York State Medicaid Program. Effective June 9, 2018, Zynex Medical's participation in the New York State Medicaid Program was terminated for "failure to reply to revalidate notice." On August 23, 2021, Zynex Medical was reinstated as a participating provider in the New York State Medicaid Program.

71.     The corporate Defendants also employed sale representatives who marketed DME to healthcare providers and patients in the State of New York during the relevant period.

72.     The corporate Defendants specifically targeted New York as part of a worldwide market. Indeed, the corporate Defendants' website includes a map of the entire United States, including New York. A true and accurate excerpt from the "Locations" page of the corporate Defendants' website is depicted below.

Case No. 1:26-cv-00913-SKC-TPO    Document 22-5    filed 03/26/26    USDC Colorado
Case 1:25-cv-04915-DLI-CHK    Document 1    filed 09/04/25    Page 13 of 117 PageID #: 13

pg 28 of 132



73.     A substantial portion of the insurance claims submitted by the corporate Defendants pertaining to Allstate claimants derive from New York.

74.     The corporate Defendants' contacts with the State of New York are substantial and not isolated.

75.     The individual Defendants each participate, directly or indirectly, in the operation and management of the corporate Defendants' business activities in New York.

76.     The Defendants have therefore engaged in purposeful activities in New York.

77.     Overall, the fraudulent scheme alleged herein has many ties to the State of New York, and the ends of justice are best served through this Court's exercise of jurisdiction over the Defendants.

## IV.    FACTUAL ALLEGATIONS

### A.    IMPACT OF DEFENDANTS' SCHEME TO DEFRAUD ON ALLSTATE

78.    Allstate insures motor vehicles and has been underwriting automobile insurance in the State of New York and all of the states in which the corporate Defendants purportedly provide DME and replenishment supplies.

79.    Providers of healthcare services can bill Allstate directly under applicable policies of insurance.

80.    Distributors of healthcare goods, such as DME and supplies, also submit bills to Allstate in connection with bodily-injury claims by Allstate claimants.

81.    In bodily-injury cases, the distributors of healthcare goods are paid directly or paid through a healthcare lien after resolution of the insurance claim.

82.    In reasonable reliance on the Defendants' omissions and material misrepresentations, Allstate issued payments to or for the benefit of the Defendants.

83.    The Defendants falsely billed Allstate for DME and supplies that were not dispensed as represented, or at all.

84.    If Allstate had been aware that the Defendants falsely billed Allstate for DME and supplies that were not dispensed as represented, or at all, Allstate would not have issued payments to or for the benefit of the Defendants concerning claims made by Allstate claimants.

85.    The Defendants also engaged in the false billing of DME and supplies by charging for items that were neither requested by Allstate claimants nor prescribed by any medical provider.

86.    If Allstate had been aware that the Defendants fraudulently billed for DME and supplies that were not requested by the claimant or prescribed by a medical provider (in violation

of laws and regulations governing medical decision-making), Allstate would not have issued payments to or for the benefit of the Defendants concerning claims made by Allstate claimants.

87.    The Defendants falsely billed for DME and supplies that were administered pursuant to a predetermined treatment protocol.

88.    If Allstate had been aware that the Defendants fraudulently billed for DME and supplies provided under a predetermined treatment protocol, Allstate would not have issued payments to or for the benefit of the Defendants concerning claims made by Allstate claimants.

**B.    STRUCTURE OF THE DEFENDANTS' SCHEME TO DEFRAUD**

89.    Sandgaard holds significant dominion and control over the Zynex scheme, acting as the lynchpin.

90.    Sandgaard's majority ownership and control over the corporate Defendants was crucial to the Zynex scheme's financial success. This control enabled him to select and install individuals like Moorhead and Lucsok in leadership positions specifically because they were willing to fabricate and submit fraudulent claims to insurers, including Allstate.

91.    On information and belief, the individual Defendants directed Zynex employees known as "Territory Managers" to complete prescription forms for Allstate claimants, circumventing the medical necessity determination of a healthcare provider.

92.    At the direction of the individual Defendants and Zynex, Zynex Medical billed Allstate for DME and supplies that were shipped through the U.S. Mail without medical documentation to demonstrate that products were prescribed by a licensed healthcare provider.

93.    In instances when prescriptions for DME and supplies were purportedly issued by licensed healthcare providers, these prescriptions were generated indiscriminately, lacking any documented clinical rationale demonstrating the effectiveness of the prescribed items in treating

the specific pain of Allstate claimants. This pattern suggests a systemic failure to ensure individualized medical necessity.

94.     The Zynex scheme further involved the routine use of a pre-populated template order form entitled Prescription & Letter of Medical Necessity ("order form"). This template unduly influenced prescribing decisions, prioritizing the Defendants' DME and supplies over a genuine and independent assessment of each Allstate claimant's unique medical needs, thereby undermining the integrity of the prescription process.

95.     On information and belief, the Zynex scheme was fundamentally predicated on the cultivation of illicit referral relationships with medical providers nationwide, fueled by the expectation of unlawful kickback payments, whether in cash or in kind, in exchange for prescribing their devices. This corrupting influence compromised the integrity of medical decision-making.

96.     The Zynex scheme further involved the unilateral and immediate shipment of excessive and unsolicited DME and replenishment supplies to patients, completely disregarding the need for prior patient request or physician authorization, and often providing quantities intended to last multiple lifetimes.

97.     While Zynex manufactured and sold multiple products, the Zynex scheme focused on Zynex Medical's flagship product, which is called the "NexWave."

98.     The corporate Defendants aggressively marketed the NexWave, portraying it as a singular, indispensable solution by claiming it seamlessly integrated three distinct electrical stimulation modalities: Interferential Current Therapy ("IFC"),[5] Transcutaneous Electrical Nerve

---

[5] IFC is a type of electrical stimulation used to relieve pain and reduce inflammation. It involves using two medium-frequency currents that cross each other, creating a low-frequency interference wave that penetrates deep into tissues.

Stimulation ("TENS"),[6] and Neuromuscular Electrical Stimulation ("NMES").[7] This multi-faceted representation was a key element in their scheme to broadly prescribe and bill for a single device, regardless of individual patient needs or the specific therapeutic benefits of each distinct modality. A true and accurate depiction of the NexWave is set out below:



99.     Zynex Medical routinely billed patients' and/or insurance companies directly for the NexWave at the inflated Manufacturer's Suggested Retail Price ("MSRP") while deliberately concealing from patients the crucial fact that Zynex Medical itself was the manufacturer, and set the rate. This intentional lack of transparency masked their predatory practice of charging exorbitant prices for the NexWave.

---

[6] TENS uses electrical currents to block or interrupt pain signals with low-voltage electrical currents to stimulate nerves and block pain signals.

[7] NMES is a therapeutic technique that uses electrical impulses to stimulate nerves and muscles. It is commonly used in rehabilitation settings to improve muscle strength, function, and range of motion.

- 17 -

100. The Defendants routinely charged $2,995.00 for the NexWave despite the fact that customers could readily purchase three separate units elsewhere for IFC, TENS, and NMES modalities at a combined total that is a fraction of the cost of the NexWave.

101. Moreover, the Defendants routinely billed Allstate the full $2,995.00 purchase price for the NexWave in cases where claimants were prescribed the device on a short-term or trial basis rather than billing the lesser—albeit still exorbitant—rental price per month.

102. The corporate Defendants' DME order form, discussed more fully below, did not indicate an option for patients to rent devices.

103. For example, in the case of Allstate claimant A.W. (Claim No. 0719030264), the prescribing provider, Robert Caldera, PA-C, clearly indicated that A.W. was getting the NexWave for a "60-90 Day Trial." A true and accurate excerpt from the order form is depicted below.



104. Included among the documents associated with A.W.'s claim was an invoice created by Zynex Medical regarding the NexWave device. This document lists both a purchase

option for $2,995.00, and a rental option for $449.00 per month. A true and accurate excerpt from this document generated by Zynex Medical is depicted below.



**HCPCS CODE BILLING INFORMATION**

E1399 - Purchase Price: $2,995.00

E1399 - Rental Price: $449.00 / month

105.    The Defendants, knowing this was a trial period, still proceeded to bill Allstate $2,995.00 for the NexWave rather than the monthly rental price for the three months A.W. used the device, which would have amounted to $1,347.00. A true and accurate excerpt from Zynex Medical's statement of A.W.'s services is depicted below.

| Date Of Service | Qty | Description | Charges |
| --- | --- | --- | --- |
| 8/29/2024 | 4 | CryoHeat Ice Cubes | $40.00 |
| 8/29/2024 | 1 | CryoHeat Universal Thera | $55.00 |
| 8/29/2024 | 1 | CryoHeat | $412.03 |
| 8/29/2024 | 2 | Lead Wire Set | $37.72 |
| 8/29/2024 | 8 | Battery–9 Volt | $19.68 |
| 8/29/2024 | 64 | Electrodes 2" Standard 4 | $392.32 |
| 8/29/2024 | 1 | NexWave | $2,995.00 |
| 9/28/2024 | 64 | Electrodes 2" Standard 4 | $392.32 |
| 9/28/2024 | 8 | Battery–9 Volt | $19.68 |
| 10/28/2024 | 8 | Battery–9 Volt | $19.68 |
| 10/28/2024 | 64 | Electrodes 2" Standard 4 | $392.32 |
| | | Total | $4,775.75 |

106.    Zynex Medical also intentionally billed for the maximum possible amount of supplies, a deliberate strategy to fraudulently inflate revenue, with full knowledge that patients did not require or were not using the products.

107.    As evidenced by the excerpt from Zynex Medical's billing guide on its website (depicted below), the company employed a calculated tactic of withholding price information for DME and replenishment supplies from inquiring patients until after the products were shipped. The guide acknowledges that Zynex Medical directly billed insurance at the MSRP. This is a deliberate maneuver to hide the outrageously high prices patients would eventually be charged, effectively eliminating their chance to compare costs, and ultimately select another vendor.

> • Zynex will invoice your insurance company for the MSRP of the device, and any monthly treatment supplies that are shipped. MSRP amount is simply a list price, and your insurance company will process and reimburse the claim according to their reimbursement schedule, if approved.

108.    Zynex Medical bills were fraudulent because the billed-for DME and replenishment supplies were (1) unnecessary; (2) medically worthless; (3) billed pursuant to a predetermined treatment protocol; and (4) fraudulently billed.

109.    Accordingly, the corporate Defendants were never eligible to collect payments from Allstate under state and federal law.

**C.    FRAUDULENT BILLING FOR MEDICALLY UNNECESSARY DEVICES AND SUPPLIES**

110.    Allstate has been subjected to a systematic pattern of billing for DME and associated supplies that were provided indiscriminately, lacking any credible medical indication that such equipment would effectively treat claimants' reported pain.

### 1.    Unlawful Prescriptions for DME and Supplies

111.    The Defendants operated with a blatant disregard for patient well-being and medical necessity, consistently prioritizing excessive profit margins above all legitimate healthcare considerations.

112.    The Defendants have cultivated a corporate culture where the singular focus of Zynex Territory Managers and sales representatives is the aggressive infiltration of medical practices worldwide. Their express purpose is to relentlessly push the sales of the corporate Defendants' overpriced DME and associated replenishment supplies, even though demonstrably similar models are readily available online or at retail pharmacies for a mere fraction of the Defendants' exorbitant markups.

113.    The corporate Defendants actively incentivized and encouraged their Territory Managers and sales representatives to directly engage with patients and aggressively generate an excessive volume of DME orders, entirely irrespective of genuine medical necessity.

114.    This egregious corporate mandate is starkly evidenced by internal recognition programs, including prestigious awards such as the "Elite Payer Mix" and "100 Order Club." Plaques commemorating these achievements are prominently displayed on the walls of the corporate office, celebrating sales metrics that prioritize volume over clinical need. For example, a LinkedIn post by Territory Manager, Kris Ramirez, overtly acknowledges the corporate Defendants' commendation, shown below, for "all that [he does] to help [Zynex Medical's] patients & prescribers every day," revealing a possessive and profit-driven view of claimants as revenue streams rather than individuals requiring medically justified care. An excerpt from the photo attached to Kris Ramirez's LinkedIn post is depicted below.



115.    Similarly, a LinkedIn post from Zynex Territory Manager, William Spector, highlights the corporate Defendants' designation of him as a "Brand Ambassador of the Month" in recognition of his "total qualifying orders and total Work Comp orders in a month," as well as his "quality of patient care when he meets them in clinics." Spector is not a licensed medical professional, and should not be making decisions regarding patients' medical care. An excerpt from William Spector's LinkedIn post is depicted below.



116.   To facilitate this relentless pursuit of revenue, Zynex Territory Managers and sales representatives furnished prescribing healthcare providers with pre-populated order forms that were designed by the Defendants to circumvent meaningful clinical oversight.

117.   These order forms all but guaranteed the ordering of a "lifetime supply" of replenishment supplies and are conveniently designed to be faxed or emailed directly back to the corporate Defendants, streamlining the process of generating unwarranted, long-term billing.

118.   Zynex Territory Managers and sales representatives then usurped medical authority by directly participating in the purported prescription process through patient interactions. Their overarching goal was to bill for the sale of a NexWave device and, more critically, to ensure perpetual billing for its associated replenishment supplies (electrode pads, lead wires, and 9-volt batteries, which were billed at excessive rates).

Case No. 1:26-cv-00913-SKC-TPO    Document 22-5    filed 03/26/26    USDC Colorado
Case 1:25-cv-04915-DLI-CHK    Document 1-38    Filed 09/04/25    Page 24 of 117 PageID #: 24
pg 25 of 132

119.    The Defendants' DME order forms, are not merely administrative documents, but rather a tool created to generate the indefinite and unwarranted charges under the false pretense of medical necessity. A true and accurate depiction of the so-called "Prescription & Letter of Medical Necessity" form is depicted below.

120.    The deceptive nature of these forms is further evidenced by a standard paragraph requiring the prescribing healthcare provider to affirm:

> I certify that the equipment and supplies I prescribed are medically necessary for this patient's well-being. This was not prescribed as convenience equipment. In my professional opinion, the equipment is both reasonable and necessary in reference to the accepted standards of medical practice and treatment for this patient's condition.

121.    Yet, this certification is rendered meaningless by the order form's inherently biased "Length of Need" section, which presents only two restrictive choices: a short-term duration of three to eighteen months, or an egregious indefinite "lifetime" prescription.  A true and accurate close-up of the Length of Need section of the order form is depicted below.



122.    The order form ensures that, at the very least, a minimum of three to eighteen months of replenishment supplies will be billed, and often guarantees a continuous stream of charges for replenishment supplies regardless of actual medical necessity or the patient's evolving condition. This manipulation of the prescription process transforms medical necessity into a mere formality, serving only to maximize the Defendants' billing.

123.    Zynex Territory Managers and sales representatives, whose roles should be limited to marketing, based on Allstate's investigation, often completed and checked boxes on these critical forms, whether with the healthcare provider's permission or not, usurping the prescribing authority of the licensed healthcare professionals.

124.    The decision to select the length of time for replenishment supplies belongs solely to a licensed healthcare professional, not a Territory Manager, and should be solely based on a patient's  medical necessity, not a sales quota or potential for increased billing. This practice constitutes an unauthorized encroachment into medical prescribing and undermines the integrity of the prescription process.

125.    This conduct is further highlighted by numerous instances wherein the medical records intended to support prescriptions submitted with the order form contained no mention whatsoever of a treating provider acknowledging or prescribing any DME, exposing a clear disconnect between documented medical necessity and billing practices.

126.    By way of example, in the case of Allstate claimant Y.H. (Claim Nos. 0710082363 and 0712490549), an order form was purportedly filled out by Physical Therapist Assistant, Lauren Tampier ("Tampier"), on May 5, 2023, one day after Y.H. visited with her at Team Rehabilitation on May 4, 2023. The order was for a Nexwave device and a lifetime prescription of monthly supplies.

127.    Attached to this May 5, 2023 order form, to justify the order, were the visit notes from an April 27, 2023 visit with Ryan Miyashiro, DPT at Team Rehabilitation, not Tampier's visit notes from May 4, 2023.

128.    Even if Tampier's May 4, 2023 visit notes had been attached to the order form, they do not reference recommending electrical stimulation DME for in-home use.

129.    In fact, none of the visit notes from any provider at Team Rehabilitation reference electrical stimulation DME for in-home use for Y.H.

130.    Despite the attachment of irrelevant visit notes from the wrong provider, the Defendants used the order form purportedly signed by Tampier to justify billing Allstate for a NexWave device, eight 9-volt batteries, and 64 packages of four electrodes on May 9, 2023.

131.    The Defendants proceeded to bill for the same supplies in June and July of 2023 based on Tampier's purported referral without any indication in Y.H.'s treatment progress notes from Team Rehabilitation that she had even been using in-home DME for electrical stimulation at all. A true and accurate copy of Zynex Medical's statement of medical services issued to Y.H. is depicted below:



132.    In a significant number of cases, based on Allstate's investigation, the order form, which served as the sole justification for the Defendants' exorbitant charges, was completed by a Zynex Territory Manager, not by the Allstate claimant's treating healthcare provider.

133.     Indeed, the Zynex Territory Managers or sales representatives, whose names are routinely listed at the bottom of the order forms, have actively interfered with patient care decisions and the ordering of DME and associated supplies. This profound conflict of interest is further highlighted by the Defendants' own internal communications, where they presumptuously referred to claimants as "our patients," blurring the critical line between a sales transaction and legitimate medical care.

134.     Indeed, the case of Allstate claimant, A.F. (Claim No. 0570082222), provides further compelling evidence that Zynex Territory Managers are consistently overstepping their bounds and engaging in the unauthorized and fraudulent prescription of DME and associated supplies.

135.     Despite the substantial billing for a DME device and supplies for in-home use, not a single entry within the treating provider's comprehensive medical records mentions, suggests, or even alludes to such a prescription for A.F. This glaring absence of any medical foundation for the DME order forcefully indicates that Zynex personnel, not licensed medical professionals, are illicitly making medical decisions, a practice that is both unethical and illegal in every jurisdiction where the corporate Defendants conduct business.

136.     Even more troublingly, the purported signature of A.F.'s prescribing provider, Boqing Chen, M.D. ("Dr. Chen"), on the November 5, 2022 Zynex Medical order form does not match his authentic signature as documented in his own medical notes from a November 9, 2022 visit with A.F. This stark discrepancy points directly to signature forgery as a means to legitimize an unprescribed device. The indelible presence of Zynex Territory Manager, Mickhail Wynter's name stamped on the bottom of A.F.'s order form further implicates Zynex personnel in this illicit scheme. True and accurate samples of these disparate signatures presented below clearly

- 28 -

demonstrate that the order for A.F.'s DME was not a legitimate medical prescription but a product

of the corporate Defendants' fraudulent billing enterprises.

137.    The Defendants' billing associated with Allstate claimant, J.D. (Claim No.

0637694563), further exemplifies Zynex's scheme. On August 14, 2021, J.D. was reportedly

injured in a motor vehicle accident, but did not seek immediate medical treatment.

138.    On October 13, 2021, J.D. presented for treatment at Neurological Specialties of

Long Island, PLLC where she was evaluated by Ian Stein, M.D. ("Dr. Stein") for a headache. At

the conclusion of this visit, Dr. Stein made referrals for EMG, EEG, and MRI testing for J.D. Dr. Stein's notes did not reference DME or electrical stimulation.

139.    On November 4, 2021, a template order form was submitted to Zynex Medical from Neurological Specialties of Long Island, PLLC, purporting to justify an order for a Horizon Lumbosacral Orthosis, a NexWave device, and monthly supplies for J.D. with a "lifetime" length of need.

140.    This initial order form had no signatures from any providers. Nor did the order form have the box checked off at the top next to Dr. Stein's name to indicate whether he was the prescribing provider. Furthermore, there was no diagnostic code, quantity to be dispensed, or frequency of use information filled in for the spinal orthosis portion of the form. True and accurate samples from the initial order form are depicted below:

- 30 -



141. A seemingly identical copy of the initial order form, again dated November 4, 2021, was submitted to Zynex Medical on January 14, 2022 purporting to order the DME and supplies for J.D. The only change to the form was the addition of an illegible signature. Accordingly, there was no clear indication of who the prescribing provider was for this second submission. True and accurate samples from the second form submitted are depicted below:





142.    A third copy of the order form was submitted to Zynex Medical on January 19, 2022. While the date written on the form was updated to January 19, 2022, the form again lacked any legible indication of who the prescribing provider was for J.D.'s DME and supplies. The only person whose name is clearly printed on the bottom of each of the order forms is that of Zynex Medical Territory Manager, Margarita Borukhova. True and accurate samples from the third form submitted are depicted below:





143.    The Defendants subsequently billed Allstate for a Horizon Lumbosacral Orthosis under code L0637, a NexWave device under miscellaneous code E1399, a set of lead wires, four 9-volt batteries, and eight packages of electrodes allegedly provided to J.D. on January 24, 2022. The Defendants then proceeded to bill monthly for eight packages of electrodes and four 9-volt batteries from February through May of 2022. On each of the invoices, the Defendants listed Dr. Stein as the referring provider. A true and accurate depiction of the statement of medical services the corporate Defendants billed for J.D. is depicted below:



Case No. 1:26-cv-00913-SKC-TPO   Document 22-5   filed 03/26/26   USDC Colorado
Case 1:25-cv-04915-DLI-CHK   Document 1-38   Filed 09/04/25   Page 34 of 117 PageID #: 34

pg 35 of 118
34

144. When Dr. Stein described the history of J.D.'s present illness, his plan of care, and the nine referrals he made in the notes from a December 7, 2021 visit in his records, he did not reference, suggest, or even allude to recommending electrical stimulation or in-home DME for J.D. This visit occurred after Dr. Stein purportedly filled out the initial Zynex order form on November 4, 2021 prescribing J.D. with Zynex DME and supplies.

145. Rather, Dr. Stein's plan of care as of December 7, 2021, consisted of J.D. continuing to use lidocaine patches, "trying Naproxen with Pepcid," and "Cycle Bazaprine [sic] 7.5 1/2 to 1 pill."

146. Similarly, Dr. Stein did not reference electrical stimulation DME for in-home use in his next set of visit notes from February 1, 2022. Rather, Dr. Stein noted that J.D. was going to have an epidural in her neck, seeing an orthopedist, getting MRIs of her hips, as well as continuing Naproxen, Cyclobenzaprine, and the lidocaine patches.

147. In fact, the first time Dr. Stein referred to electrical stimulation DME for in-home use for J.D. was several months later on July 14, 2022. Dr. Stein wrote, "I am recommending [J.D.] continue her medications," "she is doing physical therapy and she will follow up with pain management," and "she is also going to use a back brace with a stimulator from [Z]ynex."

148. The timing of Dr. Stein's first reference to electrical stimulation and/or the NexWave is inconsistent with the corporate Defendants' billing to Allstate. Dr. Stein's recommendation and future-oriented statement that J.D. was "going to" use Zynex products was made nearly two months after the Defendants' final bill for J.D.'s NexWave supplies in May of 2022, and over eight months after Dr. Stein purportedly filled out the order form prescribing these products on November 7, 2021.

149.    The complete lack of any reference to, much less proper medical foundation for, the DME and supplies allegedly prescribed by Dr. Stein in November of 2021 strongly implies that Zynex Medical personnel such as Territory Manager, Margarita Borukhova, not licensed medical professionals, were making the medical determination to provide claimants with the corporate Defendants' DME and supplies and filling out the order forms to justify bills to Allstate.

150.    The inconsistencies in J.D.'s medical records and the subsequent billing for DME and supplies are not mere oversights; they reveal a pattern of conduct that demonstrates an intent to defraud. Despite Dr. Stein's clinical notes making no mention of DME or electrical stimulation, a prescription and "medical necessity" form inexplicably appeared, ordering expensive equipment with a "lifetime" need. The glaring absence of provider signatures, unchecked boxes indicating the prescribing provider, and missing crucial diagnostic and usage details on this initial order form are not clerical errors—they are hallmarks of a system designed to circumvent legitimate medical necessity and secure unwarranted payments. This clear disconnect between documented patient care and aggressive billing practices demands scrutiny and underscores a persuasive case that this is not an isolated incident, but rather a deliberate attempt to exploit the system for financial gain.

### 2.    Improper Billing for Medically Unnecessary DME

151.    When legitimately prescribed for home use, a TENS unit generates mild electrical impulses. These impulses are delivered to the body through adhesive electrode pads placed on the skin near the area of pain, relieving pain by stimulating nerves closer to the skin's surface.

152.    When legitimately prescribed for home use, a NMES unit generates electrical impulses delivered through adhesive electrode pads placed on the skin over the target muscle. By strengthening weak muscles, it relieves associated problems such as instability or difficulty performing daily tasks.

153.    When legitimately prescribed for home use, an IFC unit generates two medium-frequency currents that "interfere" with each other within the body's tissues, creating a new, lower "beat frequency." This device delivers electrical stimulation through adhesive electrode pads and is used in physical therapy and rehabilitation to help manage pain, reduce inflammation, and promote healing in various musculoskeletal and other conditions.

154.    The NexWave device, while purportedly containing the distinct capabilities of TENS, IFC, and NMES electrotherapy modalities within a single unit, is being dispensed in a manner that is medically unreasonable and unnecessary. While the unit may indeed offer these three functions through the application of its wires on specific body locations and adjustable settings, medical professionals rarely, if ever, prescribe all three disparate modalities for a single patient. Instead, only one specific electrotherapy unit is typically indicated based on a patient's particular medical condition and therapeutic needs.

155.    Therefore, the Defendants' practice of dispensing a multi-functional NexWave unit, when a patient's condition warrants only one of its integrated therapies, serves primarily to justify a higher reimbursement rate associated with a product offering comprehensive treatments, rather than reflecting a genuine clinical necessity for all three functions.

156.    The Defendants systematically defrauded Allstate by intentionally misrepresenting their services through the use of improper Healthcare Common Procedure Coding System (HCPCS) code descriptors.

157.    While HCPCS is a recognized system for non-office physician services and Durable Medical Equipment (DME) distribution by the Centers for Medicare and Medicaid Services, the Defendants purposely employed fraudulent and inappropriate codes to inflate charges to Allstate.

158.    Among these deceptive practices, the Defendants routinely billed Allstate for their DME devices, specifically the NexWave device, under the "miscellaneous" HCPCS Code E1399.

159.    Despite Zynex Medical's assertion that code E1399 is appropriate because the NexWave offers three therapies (TENS, NMES, and IFC), rendering codes for TENS (E0730) and NMES (E0745) inappropriate, this practice of using the miscellaneous code served to fraudulently inflate billing amounts.

160.    The TENS, NMES, and IFC are all forms of electrical stimulation.  They offer distinct therapeutic applications. TENS functions by using electrical currents to block or interrupt pain signals. IFC operates similarly to TENS, but employs two alternating electrical currents that intersect within the body, generating a different frequency at the interference point to reach deeper tissues. NMES, conversely, delivers electrical impulses specifically to trigger muscle contractions. Crucially, IFC and TENS are primarily intended for pain relief, whereas NMES focuses on muscle re-education and strengthening.

161.    Despite these clear distinctions in therapeutic application, Zynex Medical's NexWave device allows users to readily change the type of modality delivered simply by arranging electrodes and lead wires appropriately and selecting one of three mode buttons on the device. True and accurate copies from the NexWave user manual, depicting these distinct electrode and lead wire patterns and modality selection buttons, demonstrate the device's capacity to deliver these varying therapies.





162.    The Defendants' consistent billing under the miscellaneous code E1399 constitutes a deliberate and calculated scheme to fraudulently inflate their profits through the miscoding of the NexWave unit.

163.    As a prime example of this deceptive practice is the case of Allstate claimant R.R. (Claim No. 0656610946). Notwithstanding the prescribing provider, Bernard Hsu, M.D. ("Dr.

Hsu"), explicitly noting on the prescription sent to Zynex Medical that the NexWave device was intended for use as a TENS unit, the Defendants brazenly billed under the inflated "miscellaneous" code E1399.

164.    This enabled the Defendants to charge a staggering $2,995.00 for the device, rather than utilizing the appropriate and less costly TENS device code E0730. This blatant act of upcoding willfully misrepresented the actual medical necessity and intended use of the device, as demonstrably evidenced by excerpts from the order form, handwritten prescription notes, and the inflated bill, all depicted below.

Case No. 1:26-cv-00913-SKC-TPO    Document 22-5    filed 03/26/26    USDC Colorado
Case 1:25-cv-04915-DLI-CHK    Document 1    Filed 09/04/25    Page 40 of 117 PageID #:
pg 55 of 132
40



| INTERFERENTIAL STIMULATION UNIT SERIAL NUMBER 224041851 | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 07 | 27 | 2022 | 07 | 27 | 2022 | 12 | | E1399 | NU | | | | ABCD | | | $2,995.00 | | 1 |
| 07 | 27 | 2022 | 07 | 27 | 2022 | 12 | | A4557 | NU | | | | ABCD | | | $18.86 | | 1 |
| 07 | 27 | 2022 | 07 | 27 | 2022 | 12 | | A4556 | NU | | | | ABCD | | | $49.04 | | 8 |
| 07 | 27 | 2022 | 07 | 27 | 2022 | 12 | | A4630 | NU | | | | ABCD | | | $9.84 | | 4 |

| 25. FEDERAL TAX I.D. NUMBER | SSN EIN | 26. PATIENT'S ACCOUNT NO. | 27. ACCEPT ASSIGNMENT? (For govt. claims, see back) | 28. TOTAL CHARGE | 29 |
|---|---|---|---|---|---|
| ▮▮▮▮ | ✓ | 783906 | ✓ YES    NO | $    $3,072.74 | $ |

| 31. SIGNATURE OF PHYSICIAN OR SUPPLIER INCLUDING DEGREES OR CREDENTIALS (I certify that the statements on the reverse thereof.) | 32. SERVICE FACILITY LOCATION INFORMATION | 33. BILLING PROVIDER INFO & |
|---|---|---|
| *[signature]* 7/27/2022 | Zynex Medical 9655 Maroon Circle Englewood, CO 80112 | Zynex Medical PO BOX 840932 Dallas, TX 75284-0932 |
| SIGNED    DATE | a.  NPI    b. | a.  1770511552    NPI    b. |

165. This fraudulent billing practice is further corroborated by the authoritative guidance of the Pricing, Data Analysis, and Coding ("PDAC") company. As the designated contractor for the Centers for Medicare and Medicaid Services ("CMS") responsible for assisting manufacturers and suppliers of Durable Medical Equipment, Prosthetics, Orthotics, and Supplies ("DMEPOS") in verifying correct HCPCS codes for Medicare billing, PDAC's directives are conclusive.

166. The PDAC—which also maintains the Durable Medical Equipment Coding System ("DMECS") to determine correct HCPCS codes, provides national fee schedule information, and processes manufacturer coding requests—explicitly states that IFC devices, even when configured for pain relief (like a TENS unit) or to mimic NMES for muscle treatment, must be billed using code E0730 (for TENS use) or code E0745 (for NMES use).

167. Critically, the PDAC has unequivocally clarified that miscellaneous codes, such as E1399, must not be used to charge Medicare for IFC devices. The Defendants' use of E1399 therefore directly contravenes established and readily available official coding guidelines, demonstrating a willful disregard for proper billing procedures and reinforcing the fraudulent nature of their charges. Pursuant to the American Medical Association ("AMA"), it is the provider's responsibility to select the most accurate billing codes for services rendered, which the Defendants have routinely failed to do.

168. The Defendants' fraudulent intent is unequivocally demonstrated by their selective and opportunistic application of billing codes.

169. In clear contrast to their inflated charges, the Defendants have, in specific instances, correctly utilized code E0730 to bill for the NexWave device when utilized for TENS. This fact alone irrefutably proves their explicit knowledge of the appropriate billing code and its significantly lower associated charge.

170.    For instance, as evidenced by the invoice and Zynex Medical's statement of medical services depicted below, Allstate was billed a mere $76.25 under code E0730 for claimant H.D.'s (Claim No. 0562921189-01) NexWave device on February 21, 2020.

Case No. 1:26-cv-00913-SKC-TPO    Document 22-5    filed 03/26/26    USDC Colorado
Case 1:25-cv-04915-DLI-CHK    Document 1-3 filed 09/04/25    Page 43 of 117 PageID #: 43
pg 58 of 132



171.    This documented instance of correct billing directly undermines any conceivable claim of error or ignorance regarding proper coding in other cases, including R.R.'s.

172.    It conclusively establishes the Defendants' awareness of the legitimate billing procedure, and exposes the Defendants' deliberate and calculated choice to utilize the grossly inflated E1399 code when defrauding other claimants, confirming a pattern of calculated malfeasance.

173.    Accordingly, the Defendants clearly engaged in a scheme to defraud Allstate by fraudulently billing DME using HCPCS miscellaneous code E1399.

174.    All of the billing utilizing HCPCS E1399 was fraudulent, including all of those identified in Exhibit 1.

**3.    Improper Billing for Medically Unnecessary DME Replenishment Supplies**

175.    As detailed above, the Defendants distributed template order forms to treatment providers that limit the "Length of Need" for the NexWave and its associated supplies to two choices: a broad range of three to eighteen months, or an egregious "lifetime" prescription. The default option, if the prescriber makes no selection, is a "lifetime" length of need.

176.    A "lifetime" supply of any medical device or associated replenishment supplies would necessitate a medical diagnosis of chronic pain, indicating a long-term, ongoing medical necessity. Despite this critical requirement, the Defendants routinely shipped out perpetual supplies to patients even in the complete absence of a medical diagnosis of chronic pain, thereby defrauding payers by billing for supplies without proper medical justification.

177.    The Defendants' use of pre-populated template order forms that automatically default to perpetual or "lifetime" supplies, absent individualized medical assessment and proper justification, constitutes an inherently fraudulent mechanism.

178.    This calculated design ensures a false justification for continuous, unnecessary, and an inflated stream of billing for supplies, circumventing genuine medical necessity and demonstrating a clear intent to maximize profits through deceptive means rather than legitimate patient care.

179.    The Defendants engaged in this automatic shipment scheme without any legitimate medical justification or even a basic analysis to determine whether patients actually used the NexWave or the purported "replenishment" supplies.

180.    On information and belief, employees of the corporate Defendants did not regularly and consistently contact patients—nor were they directed to by the Defendants—to confirm that

the items were needed and wanted before automatically sending and billing for replenishment supplies.

181.    Indeed, upon information and belief, patients received numerous shipments of DME supplies from the Defendants that they did not use or want, and that ultimately went to waste.

182.    This complete absence of due diligence underscores the Defendants' singular focus on maximizing revenue through unnecessary billing, rather than assessing genuine patient need or device usage.

183.    Moreover, the Defendants' own instructional materials directly contradict their practice of continuously shipping and billing for excessive supplies.

184.    The user manual that accompanies the electrodes for the NexWave, for example, indicates that there are four electrodes in each package, and recommends that the electrodes be changed after 25 uses. The user manual for the NexWave device describes the AC power adapter that can be used to power the device without the need for 9-volt batteries. Furthermore, a "Troubleshooting Guide" for the NexWave explains that if there are connection issues, the lead wires are likely damaged or defective such that they need to be replaced—indicating that the lead wires are designed for long term use rather than needing regular, much less monthly, replacement. True and accurate excerpts from the Defendants' electrodes user manual, NexWave user manual, and NexWave "Troubleshooting Guide" are depicted below, respectively.





**Step 3: Test the Channels**

1. Power on the device and increase each channel one at a time.
2. If you see the "Check Connections" error on one channel:
   - Turn off the device.
   - Swap the wires between the two ports.
     - Example: If Channel 1 shows an error with the grey wire, and Channel 2 works with the black wire, switch the wires - move the grey wire to Channel 2 and the black wire to Channel 1.
   - Turn the device back on and test each channel again.
3. If the error follows the wire to the new port, the wire is likely faulty.
   - **Please submit a request to be sent complimentary replacement lead wire.**
4. If the device loses connections mid-treatment:
   - Gently shake the lead wires while the device is on.
   - If the connection cuts out from this, the lead wires are likely damaged.
     - **Please submit a request to be sent complimentary replacement lead wire.**

185.    Contrary to their own instructional materials and irrespective of specific patients' medical need—or lack thereof—for supplies, the Defendants routinely billed Allstate $1,584.00 for 64 packages of four electrodes, $39.00 for a set of two lead wires, and $79.92 for eight 9-volt batteries on a monthly basis for the automatic shipment of replenishment supplies to Allstate claimants in excess of need.

186.    By way of example, the Defendants billed Allstate these same amounts for 64 packages of four electrodes, a set of lead wires, and eight 9-volt batteries for claimant A.A. (Claim No. 0736803487) on a monthly basis for thirteen straight months from December of 2023 through December of 2024. If actually delivered to A.A., these shipments amounted to an absurd 3,328 electrodes, 13 extra sets of lead wires, and 104 9-volt batteries. A true and accurate excerpt from the invoice for A.A.'s December 12, 2023 date of service is depicted below.

Case No. 1:26-cv-00914-SKC-TPO   Document 22-5   filed 03/26/26   USDC Colorado
Case 1:25-cv-04915-DLI-CHK   Document 1   Filed 09/04/25   Page 48 of 117 PageID #: 48
pg 63 of 132

| 24. A. DATE(S) OF SERVICE From | | | To | | | B. PLACE OF SERVICE | C. EMG | D. PROCEDURES, SERVICES, OR SUPPLIES (Explain Unusual Circumstances) CPT/HCPCS | MODIFIER | | | E. DIAGNOSIS POINTER | F. $ CHARGES | G. DAYS OR UNITS | H. EPSDT Family Plan | I. ID. QUAL. | J. RENDERING PROVIDER ID. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| MM | DD | YY | MM | DD | YY | | | | | | | | | | | | |
| INTERFERENTIAL STIMULATION UNIT SERIAL NUMBER 234106649 | | | | | | | | | | | | | | | | | |
| 12 | 12 | 23 | 12 | 12 | 23 | 12 | | E1399 | NU | | | AB | 2995 00 | 1 | | NPI | 1770511552 |
| Electrodes, pair | | | | | | | | | | | | | | | | | |
| 12 | 12 | 23 | 12 | 12 | 23 | 12 | | A4556 | NU | | | AB | 1584 00 | 64 | | NPI | 1770511552 |
| Repl bat t.e.n.s. own by pt | | | | | | | | | | | | | | | | | |
| 12 | 12 | 23 | 12 | 12 | 23 | 12 | | A4630 | NU | | | AB | 79 92 | 8 | | NPI | 1770511552 |
| Lead wires, pair | | | | | | | | | | | | | | | | | |
| 12 | 12 | 23 | 12 | 12 | 23 | 12 | | A4557 | NU | | | AB | 39 00 | 1 | | NPI | 1770511552 |
| | | | | | | | | | | | | | | | | NPI | |
| | | | | | | | | | | | | | | | | NPI | |

| 25. FEDERAL TAX I.D. NUMBER | SSN EIN | 26. PATIENT'S ACCOUNT NO. | 27. ACCEPT ASSIGNMENT? (For govt. claims, see back) | 28. TOTAL CHARGE | 29. AMOUNT PAID | 30. Rsvd for NU |
|---|---|---|---|---|---|---|
| ██████ | ☐ ☒ | 1090193 | ☒ YES ☐ NO | $ 4697 92 | $ | |

| 31. SIGNATURE OF PHYSICIAN OR SUPPLIER INCLUDING DEGREES OR CREDENTIALS (I certify that the statements on the reverse apply to this bill and are made a part thereof.) Zynex Medical | 332B00000X | SIGNED 12/14/2023 DATE | 32. SERVICE FACILITY LOCATION INFORMATION Zynex Medical 9655 Maroon Circle Englewood, CO 801125914 a.1770511552 b. | 33. BILLING PROVIDER INFO & PH # ( 800 ) 495-6670 Zynex Medical PO Box 840932 Dallas, TX 752840932 a.1770511552 b.ZZ332B00000X |
|---|---|---|---|---|

187.    Replenishment supplies for the NexWave device, like all medical equipment and supplies, must be reasonable and medically necessary. The Defendants' indiscriminate and perpetual shipment of supplies, irrespective of actual patient need or usage, directly contravenes this fundamental principle of medical necessity.

188.    This egregious practice enables the Defendants to relentlessly bill for and inundate claimants with excessive supplies, including electrodes, lead wires, and batteries, that are neither wanted nor needed. Consequently, in 2024, a staggering 69% of Zynex's $192,354,000 net revenue was derived from the sale of these unmerited supplies, while its devices accounted for a mere 31% of its total revenue, directly illustrating the Defendants' scheme to profit from unnecessary recurring charges.

189.    The Defendants' automatic shipment scheme directly results in the billing for grossly excessive and medically unnecessary supplies, as starkly exemplified by the case of claimants J.C.1 and J.C.2 (Claim No. 0689736816).

190.    For ten consecutive months, from June 2023 through March 2024, this married couple residing at the same address were fraudulently billed monthly for an astounding 64 packages of four electrodes, eight 9-volt batteries, and a set of two lead wires *each*.

191.    This predatory billing culminated in charges for two NexWave devices along with a staggering 5,120 electrodes, 160 9-volt batteries, and 20 lead wire sets purportedly shipped to the claimants' shared address.

192.    Given the Defendants' own recommendation in their electrodes user manual that electrodes be changed after 25 uses, and even assuming a generous once-daily use of the device using the maximum amount of four electrodes during each application, this quantity amounts to an absurd nearly 88 years' worth of electrodes—equating to 44 years each for claimants J.C.1 and J.C.2. This egregious oversupply definitively proves the Defendants' calculated intent to defraud Allstate. A true and accurate sample of Zynex Medical's statement of services billed regarding J.C.2 is depicted below:



# STATEMENT OF MEDICAL SERVICES

**ZYNEX MEDICAL™**

9655 Maroon Circle
Englewood, CO 80112-5914
Phone: 1-800-495-6670

J████ C███
███████████

| | |
|---|---|
| Account Number: | 973425 |
| Patient Name: | Ja████ C███ |
| Prescribing Physician: | Kimberly Ting, MD |
| Insurance: | USAA |

| | |
|---|---|
| Print Date: | 4/3/2024 |
| DUE UPON RECEIPT | |
| Statement Dates: | 1/1/2000 |
| | to  4/3/2024 |

☐ Check Enclosed

Amount Enclosed  $ ☐☐☐☐☐.☐☐

**Pay by Credit Card**    VISA  MasterCard  DISCOVER  AMERICAN EXPRESS

Expiration �_____

Credit Card No. _____

Signature _____

............ cut here ............ CHECK PAYMENT REMITTANCE FORM : Please enclose with payment by check : DO NOT SEND CASH ............ cut here ............

| Date Of Service | Qty | Description | Charges | Insurance Adjust | Insurance Allow | Insurance Payment | Provider Adjust | Patient Payment | Patient Balance |
|---|---|---|---|---|---|---|---|---|---|
| 6/22/2023 | 64 | Electrodes  2" Standard  4 | $1,584.00 | $0.00 | $0.00 | $0.00 | ($316.80) | $0.00 | $1,267.20 |
| 6/22/2023 | 8 | Battery-9 Volt | $79.92 | $0.00 | $0.00 | $0.00 | ($15.98) | $0.00 | $63.94 |
| 6/22/2023 | 1 | Lead Wire Set | $39.00 | $0.00 | $0.00 | $0.00 | ($7.80) | $0.00 | $31.20 |
| 6/22/2023 | 1 | NexWave | $2,995.00 | $0.00 | $0.00 | $0.00 | ($599.00) | $0.00 | $2,396.00 |
| 7/22/2023 | 1 | Lead Wire Set | $39.00 | $0.00 | $0.00 | $0.00 | ($7.80) | $0.00 | $31.20 |
| 7/22/2023 | 64 | Electrodes  2" Standard  4 | $1,584.00 | $0.00 | $0.00 | $0.00 | ($316.80) | $0.00 | $1,267.20 |
| 7/22/2023 | 8 | Battery-9 Volt | $79.92 | $0.00 | $0.00 | $0.00 | ($15.98) | $0.00 | $63.94 |
| 8/22/2023 | 64 | Electrodes  2" Standard  4 | $1,584.00 | $0.00 | $0.00 | $0.00 | ($316.80) | $0.00 | $1,267.20 |
| 8/22/2023 | 1 | Lead Wire Set | $39.00 | $0.00 | $0.00 | $0.00 | ($7.80) | $0.00 | $31.20 |
| 8/22/2023 | 8 | Battery-9 Volt | $79.92 | $0.00 | $0.00 | $0.00 | ($15.98) | $0.00 | $63.94 |
| 9/22/2023 | 8 | Battery-9 Volt | $79.92 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $79.92 |
| 9/22/2023 | 64 | Electrodes  2" Standard  4 | $1,584.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $1,584.00 |
| 9/22/2023 | 1 | Lead Wire Set | $39.00 | $0.00 | | $0.00 | $0.00 | $0.00 | $39.00 |
| 9/27/2023 | 1 | Medical Files | $45.00 | $0.00 | $0.00 | ($45.00) | $0.00 | $0.00 | $0.00 |
| 9/27/2023 | 1 | Medical Files | $45.00 | $0.00 | $0.00 | ($45.00) | $0.00 | $0.00 | $0.00 |
| 10/22/2023 | 64 | Electrodes  2" Standard  4 | $1,584.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $1,584.00 |
| 10/22/2023 | 8 | Battery-9 Volt | $79.92 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $79.92 |
| 10/22/2023 | 1 | Lead Wire Set | $39.00 | $0.00 | | $0.00 | $0.00 | $0.00 | $39.00 |
| 11/22/2023 | 1 | Lead Wire Set | $39.00 | $0.00 | | $0.00 | $0.00 | $0.00 | $39.00 |
| 11/22/2023 | 8 | Battery-9 Volt | $79.92 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $79.92 |
| 11/22/2023 | 64 | Electrodes  2" Standard  4 | $1,584.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $1,584.00 |
| 12/22/2023 | 64 | Electrodes  2" Standard  4 | $1,584.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $1,584.00 |
| 12/22/2023 | 8 | Battery-9 Volt | $79.92 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $79.92 |
| 12/22/2023 | 1 | Lead Wire Set | $39.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $39.00 |
| 1/22/2024 | 64 | Electrodes  2" Standard  4 | $1,584.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $1,584.00 |
| 1/22/2024 | 1 | Lead Wire Set | $39.00 | $0.00 | | $0.00 | $0.00 | $0.00 | $39.00 |
| 1/22/2024 | 8 | Battery-9 Volt | $79.92 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $79.92 |
| 2/22/2024 | 1 | Lead Wire Set | $39.00 | $0.00 | | $0.00 | $0.00 | $0.00 | $39.00 |
| 2/22/2024 | 8 | Battery-9 Volt | $79.92 | $0.00 | | $0.00 | $0.00 | $0.00 | $79.92 |
| 2/22/2024 | 64 | Electrodes  2" Standard  4 | $1,584.00 | $0.00 | | $0.00 | $0.00 | $0.00 | $1,584.00 |
| 3/22/2024 | 64 | Electrodes  2" Standard  4 | $1,584.00 | $0.00 | | $0.00 | $0.00 | $0.00 | $1,584.00 |
| 3/22/2024 | 8 | Battery-9 Volt | $79.92 | $0.00 | | $0.00 | $0.00 | $0.00 | $79.92 |

193.    J.C.1's statement during a February 20, 2025 deposition described the continuous arrival of supplies as "duplicates" illustrates the unnecessary and unwanted character of the shipments.

194.    Further underscoring their fraudulent intent, the Defendants relentlessly continued their monthly billing for these excessive supplies to J.C.1 and J.C.2 based on an initial referral from Kimberly Ting, M.D. ("Dr. Ting") even though Dr. Ting had ceased treating the claimants, and explicitly informed Zynex Medical that her last day with Direct Orthopedic Care was July 11, 2023, and had even recommended the claimants seek treatment elsewhere.

195.    This blatant disregard for the prescribing physician's explicit instruction to seek alternative care strongly indicates a deliberate and ongoing fraudulent scheme to continue billing for medically unnecessary supplies without any valid, current, or ethical medical justification.

196.    The Defendants have gone as far as to brazenly disregard the explicit instructions of prescribing providers by automatically and repeatedly shipping supplies even when the prescriber indicated they were not wanted.

197.    As a compelling example of this fraudulent practice, in the case of claimant, K.Y. (Claim No. 0703466128), provider Sheila Kupersmith, FNP-BC ("Kupersmith"), issued a handwritten prescription on April 7, 2023, for a "TENS unit (Zynex NexWave) for back [and] neck pain."

198.    Crucially, Kupersmith explicitly checked the "DO NOT REPEAT" box on the prescription, which is set out below, thereby clearly indicating that this was a one-time prescription.



199.    Further exposing the Defendants' fraudulent scheme, Kupersmith's visit notes from March 20, 2023—the only set of Kupersmith's notes from after the date of loss in February of 2023—make no reference whatsoever to a TENS device, Zynex and/or Zynex Medical, or electric stimulation for in-home use.

200.    Nowhere on this prescription did Kupersmith reference supplies for the TENS device, much less authorize automatic monthly shipments of supplies. Nor is there documentation of Kupersmith completing a Zynex Medical order form that the Defendants could attempt to use as a pretext to justify the unauthorized shipments of replenishment supplies.

201.    Contrary to Kupersmith's prescription and without medical justification, the Defendants billed Allstate every month from June of 2023 through January of 2024 for monthly replenishment supplies for K.Y., purportedly justified by Kupersmith's initial prescription. A true

and accurate sample from the invoice for a NexWave device and first set of supplies for K.Y. for

June of 2023—over two months after Kupersmith's April 7, 2023 prescription—is depicted below.

| 24. A. DATE(S) OF SERVICE From MM DD YY | To MM DD YY | B. PLACE OF SERVICE | EMG | D. PROCEDURES, SERVICES, OR SUPPLIES (Explain Unusual Circumstances) CPT/HCPCS | MODIFIER | E. DIAGNOSIS POINTER | F. $ CHARGES | G. DAYS OR UNITS | H. EPSDT Family Plan | I. ID. QUAL | J. RENDERING PROVIDER ID. # |
|---|---|---|---|---|---|---|---|---|---|---|---|
| INTERFERENTIAL STIMULATION UNIT SERIAL NUMBER 234033698 | | | | | | | | | | | |
| 06 15 2023  06 15 2023 | | 12 | | E1399 | NU | AB | $2,995.00 | 1 | | NPI | 1770511552 |
| 06 15 2023  06 15 2023 | | 12 | | A4556 | NU | AB | $1,584.00 | 64 | | NPI | 1770511552 |
| 06 15 2023  06 15 2023 | | 12 | | A4557 | NU | AB | $39.00 | 1 | | NPI | 1770511552 |
| 06 15 2023  06 15 2023 | | 12 | | A4630 | NU | AB | $79.92 | 8 | | NPI | 1770511552 |
| | | | | | | | | | | NPI | |
| | | | | | | | | | | NPI | |

| 25. FEDERAL TAX I.D. NUMBER  SSN  EIN | 26. PATIENT'S ACCOUNT NO. | 27. ACCEPT ASSIGNMENT? (For govt. claims, see back) | 28. TOTAL CHARGE | 29. AMOUNT PAID | 30. Rsvd for NUCC |
|---|---|---|---|---|---|
| [REDACTED] ☐ ☑ | 968508 | ☑ YES ☐ NO | $ 4,697.92 | $ 0.00 | |

31. SIGNATURE OF PHYSICIAN OR SUPPLIER INCLUDING DEGREES OR CREDENTIALS (I certify that the statements on the reverse apply to this bill and are made a part thereof.)

SIGNED *[signature]*    DATE 6/15/2023

32. SERVICE FACILITY LOCATION INFORMATION
Zynex Medical
PO BOX 840932
Dallas, TX 75284-0932

33. BILLING PROVIDER INFO & PH # (800) 4956670
Zynex Medical
PO BOX 840932
Dallas, TX 75284-0932
a. 1770511552    b.

202.    This complete lack of medical authorization underscores the Defendants' intentional and fraudulent oversupplying.

203.    The Defendants' practice of bombarding customers with unnecessary supplies is not isolated to the examples described herein, but rather a well-documented and widespread grievance. The Complaint filed in the class action lawsuit previously mentioned directly corroborates this by citing Michelle Bean's experience, prominently featured in a June 4, 2024 STAT News publication titled "How a Device Maker Inundated Pain Patients With Unwanted Batteries and Surprise Bills."

204.    Despite using her NexWave only a handful of times, Michelle was subjected to monthly shipments of electrodes and batteries for two years, ultimately resorting to threatening legal action after refusing to pay for these unneeded supplies.

205.    Similar complaints are made regularly by the corporate Defendants' customers, further establishing a pattern of unauthorized and unsolicited supply shipments. True and accurate samples of consumer complaints to the Better Business Bureau ("BBB") regarding the Defendants' unauthorized shipment of supplies are depicted below:

**Initial Complaint**                                    Type: $ Billing Issues
Date: 03/28/2025                                          Status: 💬 Answered

I was prescribed a TENS device with ********************** by my doctor in July/August 2023. The device was sent to me and my insurance informed me that they were not covering it as they would only cover it under 2 specific circumstances, one of those two circumstances was my condition. My doctor called my insurance company and they agreed to cover it, so I called Zynex and let them know. They did not send me a bill for ~6 months so I assumed it was resolved. They then sent me a bill showing it was still not covered by insurance. My doctor called insurance again and they said that they will pay it but it had not been resubmitted to them. I called Zynex again and let them know. Zynex also sends supplies monthly but bills only a couple times a year. When I realized what I was being charged in summer of ************************************************************** (they did not, they sent me more), and by October ********************************* supplies. Again, they did not and every few months would send me even more. I now have 90+ unopened packages of the supplies they keep sending me, even after I asked them to stop many times, which they are continuing to bill myself and my insurance for. I received another bill where they were still charging me for the device. I talked to them again and they admitted they never resubmitted it to insurance, but it was now too late to do so, so I owed them the money. I asked how they could refuse to resubmit it to insurance after my doctor and I got authorization and bill me instead and they said they would get back to me about it and never did. I have repeatedly tried to contact them about that as well as sending me supplies that I have cancelled many times over the past 9 months that they are then billing me for. They refuse to stop sending them. They refuse to stop billing myself and my insurance for them. They just tell me I will hear back and never do. This is fraud. They are defrauding myself and my insurance company.

**Initial Complaint**                                    Type: $ Billing Issues
Date: 04/15/2025                                          Status: 💬 Answered

After multiple years of attempting to cancel these auto send, they finally did this year and now I received a 500+ dollar bill. I uploaded the bill so u can see when I cancelled it because my insurance stopped paying and yet every month I get charged for 9v batteries and leads. I have them all and can send them back it they need it. I am not paying this as it is predatory sales tactics. I cancelled this in 2023 and yet they just cancelled it this month and now they want money? never got a bill until the cancellation went through.

**Initial Complaint**

Date: 11/19/2024

Type: $ Billing Issues

Status: Answered

My complaint is just like the numerous others that are on file. They sent a tens machine with initial supplies. They kept sending supplies that WERE NOT AUTHORIZED. I called on 9-9-24 (my charges go all the way back to 11-6-22. I talked to a man named ****** at 4:33 pm. He wouldn't give me his last name and he wouldn't let me talk to his supervisor. I've been calling again, and they claim they have no record of this call. The last man I spoke to insinuated that I was lying about calling. They will not write the balance off. I am appalled by the way this company is charging me and others. Can you help me please?

206.    These complaints, a mere sample of the over 200 complaints available from the last three years on the BBB's website regarding Zynex Medical, detail recurring deliveries of supplies by the Defendants on a subscription basis that the consumers did not request or authorize, or worse, that consumers have repeatedly requested be terminated to no avail.

207.    The overwhelming volume of consumer complaints concerning the Defendants' automatic shipment of supplies is so pervasive that the corporate Defendants have been compelled to address it directly within the FAQ section of their own website.

208.    This pre-emptive "defense" inadvertently highlights the widespread and questionable nature of a practice so egregious it demands public justification. Alarmingly, and lacking any legitimate medical qualifications or individualized patient assessment, the Defendants have unilaterally determined that the continuous and automatic replenishment of supplies constitutes a blanket medical necessity for all claimants.

209.    This profound disregard for individual patient needs, proper medical judgment, and ethical billing practices is further evidenced by the FAQ excerpt depicted below:

210. The Defendants acknowledge in the NexWave user manual that the device's "[e]ffectiveness is highly dependent upon patient selection by a person qualified in management of pain patients," that "[e]lectrode placement and stimulation settings should be based on the guidance of a prescribing physician," and that the NexWave "should only be used under the continued supervision of a physician."

211. Contrary to their own instructional materials, by automatically dispensing DME supplies to patients and unilaterally deciding that monthly replenishment supplies are medically necessary, the Defendants have effectively elevated themselves to the position of medical decision makers.

212. The DME supplies billed to Allstate by the Defendants that were dispensed on an automatic basis, without regard for claimants' needs, were not necessary and are not compensable under state or federal laws.

213. All of the bills submitted by the Defendants through the U.S. Mail seeking payment from Allstate for unnecessary DME and supplies are fraudulent. *See* Exhibits 2-6.

### 4. Improper Billing for Medically Unnecessary Conductive Garments for NexWave Device

214. In certain circumstances, the Defendants billed Allstate for conductive garments purportedly for use in connection with the NexWave.

- 56 -

215.    Conductive garments are intended to be used instead of standard electrodes in cases where a conductive garment is necessary for particular patients' care.

216.    Despite the fact that conductive garments are an alternative to standard electrodes, the Defendants repeatedly billed Allstate for standard electrodes where claimants had already been provided with a conductive garment in order to inflate bills by charging for both without any medical justification.

217.    Therefore, any bills where the Defendants charged for electrodes for claimants that were already provided with a conductive garment are fraudulent.

218.    Conductive garments are intended to be used instead of standard electrodes in cases where a conductive garment is necessary for particular patients' care. Accordingly, any electrodes billed to Allstate for a patient purportedly dispensed with a conductive garment were not medically necessary.

219.    However, the use of conductive garments is rarely reasonable or medically necessary. A conductive garment may only be necessary where the area to be treated is large or inaccessible, where the use of conventional electrodes is not feasible due to frequency of treatment, where the patient has a documented medical condition that precludes standard electrode use, or where the patient requires treatment beneath a cast.

220.    The Defendants did not document any justification for conductive garments billed to Allstate.

221.    In fact, the Defendants' order form allows prescribers to check a box to order the NexWave, "monthly supplies," *and* a "Conductive Garment when applicable." An excerpt from the order form is depicted below:

222.   The order form does not describe any specific medical justification for the conductive garment, nor does it provide the ability to order the conductive garment without also ordering monthly supplies such as standard electrodes.

223.   Using this strategy, the Defendants ensure that every order for a NexWave device using their template order form purportedly allows them to send an onslaught of replenishment supplies, and for them to decide when a conductive garment is "applicable."

224.   The Defendants billed Allstate for conductive garments in addition to multiple sets of standard electrodes and/or without proper medical justification.

225.   By way of example, in the case of claimant P.H. (Claim No. 0643491319), the Defendants billed Allstate for a NexWave, two sets of two lead wires, 32 packages of standard electrodes, and eight 9-volt batteries for December 3, 2021 based on a referral by Zhangliang Ma, M.D. ("Dr. Ma") at the NEA Baptist Pain Management Clinic.

226.   On December 28, 2021, P.H. presented for treatment at NEA Baptist Clinic Neurosurgery and reported to Danny Lee Ricker, NP that she had "been using a TEN[S] unit that has not helped."

227.   Notwithstanding P.H.'s clear statement that the NexWave did not help her symptoms, on January 18, 2022, the Defendants billed $595.00 for a conductive garment—purportedly based on Dr. Ma's initial referral.

228.    The Defendants then proceeded to bill Allstate for 32 packages of unnecessary standard electrodes in both February and March of 2022, despite having already billed for the conductive garment. A true and accurate sample from Zynex's statement of medical services regarding P.H. is depicted below:



229.    Notably, Dr. Ma's notes from his December 1, 2021 visit with P.H. do not reference recommending or prescribing an electrical stimulation device for in-home use, much less justify the need for a conductive garment. Rather, Dr. Ma's notes indicate that he ordered DME in the form of a platform attachment for P.H.'s walker, prescribed Norco, and scheduled a psychological evaluation.

230.    All of the bills submitted by the Defendants through the U.S. Mail seeking payment from Allstate for medically unnecessary conductive garments, and for unnecessary electrodes in cases where conduct garments were billed, are fraudulent. *See* Exhibits 2 and 6.

**5.    Fraudulent Charges for NexWave Supplies Included with Device**

231.    The proper codes for TENS devices (E0730) and NMES devices (E0745) include the cost of the initial supplies associated with the unit.

232.    Specifically, codes E0730 and E0745 include lead wires and one month's supply of electrodes, conductive paste or gel if needed, and batteries.

233.    According to its user manual, the NexWave device comes with a set of lead wires, a package of four square electrodes, a package of four round electrodes, a power supply cord, and a 9-volt battery. A true and accurate excerpt from the NexWave user manual's accessory list is depicted below.

234.    When billing for the NexWave device, however, the Defendants billed separately for the included initial supplies such as electrodes (A4556), lead wires (A4557), and batteries (A4630) on the same date of service.

235.    For example, in the case of claimant T.W. (Claim No. 0646120675-04), the Defendants billed separately for eight packages of electrodes, a set of two lead wires, and four 9-volt batteries on the initial invoice for T.W.'s NexWave device. A true and accurate excerpt from the invoice for T.W.'s NexWave and associated supplies is depicted below.

236.    Likewise, for claimant J.C. (Claim No. 0729228510), the Defendants billed for two sets of lead wires, eight 9-volt batteries, and 64 packages of four electrodes separately from the NexWave on the April 30, 2024 date of service. A true and accurate excerpt of the bill for J.C.'s NexWave and initial supplies is depicted below.

Case No. 1:26-cv-00913-SKC-TPO    Document 22-5    filed 03/26/26    USDC Colorado
Case 1:25-cv-04915-DLI-CHK    Document 1-1 Filed 09/04/25    Page 62 of 117 PageID #: 62
pg 77 of 132

237.    To the extent the Defendants assert that these initial supplies billed for are separate from and in addition to those included with the NexWave, those supplies are duplicative and not medically necessary.

238.    All of the bills submitted by the Defendants through the U.S. Mail seeking payment from Allstate for DME supplies included with the NexWave device using HCPCS Codes A4556 (electrodes), A4557 (lead wires), and A4630 (batteries) are fraudulent and not compensable under the applicable fee schedules. *See* Exhibits 2-4.

### 6.    Fraudulent Charges for Replenishment Supplies

239.    The Defendants used the NexWave device as a vehicle to generate additional charges for a litany of unnecessary supplies at inflated prices.

240.    HCPCS Code A4595 is an all-inclusive code for billing the supplies used with electrical stimulator devices such as the NexWave. Code A4595 covers a monthly allowance for necessary supplies such as electrodes and batteries.

241.    The Defendants routinely engaged in fraudulent billing for the automatic shipment of replenishment supplies to Allstate claimants by submitting bills containing separate charges for electrodes (A4556), lead wires (A4557), and batteries (A4630).

242.    For example, the Defendants unbundled monthly charges for supplies for claimant J.S. (Claim No. 0733868129) on ten dates of service from June 9, 2023 through March 9, 2024, including electrodes (A4556), lead wires (A4557), and batteries (A4630), purportedly for use in connection with a NexWave device dispensed to J.S. on June 9, 2023.

243.    Moreover, the Defendants' billing was inconsistent for many of J.S.'s dates of service.

244.    For the June 9, 2023 date of service, the Defendants billed $3,995.00 for the NexWave using miscellaneous code E1399, and fraudulent charges for 64 packages of electrodes ($1,584.00), eight 9-volt batteries ($79.92), and a set of lead wires ($39.00). A true and accurate excerpt of the bill for J.S.'s June 9, 2023 date of service is depicted below.



245.    For the July 9, 2023 and August 9, 2023 dates of service, the Defendants again charged for 64 packages of electrodes ($1,584.00), eight 9-volt batteries ($79.92), and a new set of lead wires ($39.00) each month.

246.    The Defendants issued three separate bills for J.S.'s supplies for the September 9, 2023 date of service, each with different amounts charged for the same supplies. The first bill, issued on September 9, 2023, was similar to that of July and August, with fraudulent charges for 64 packages of electrodes ($1,584.00), eight 9-volt batteries ($79.92), and another set of lead wires ($39.00). The second bill, issued on December 28, 2023, included fraudulent charges for the same number of each item, but charged $1,033.60 for the electrodes, $56.40 for the 9-volt batteries, and $16.11 for the set of lead wires. The third bill, issued on April 11, 2024, used the supplies code (A4595) to bill $2,232.00 for 32 units of supplies. True and accurate samples from the three invoices for the September 9, 2023 date of service are depicted below.



Case 1:25-cv-04915-DLI-CHK    Document 22-5    Filed 09/04/25    Page 65 of 117 PageID #: 65

| 24. A. DATE(S) OF SERVICE | | | | | | B. PLACE OF SERVICE | C. EMG | D. PROCEDURES, SERVICES, OR SUPPLIES (Explain Unusual Circumstances) | | E. DIAGNOSIS POINTER | F. $ CHARGES | G. DAYS OR UNITS | H. EPSDT Family Plan | I. ID. QUAL. | J. RENDERING PROVIDER ID. # |
| From MM | DD | YY | To MM | DD | YY | | | CPT/HCPCS | MODIFIER | | | | | | |
| Electrodes, pair | | | | | | | | | | | | | | | |
| 09 | 09 | 23 | 09 | 09 | 23 | 12 | | A4556 | NU | ABCD | 103360 | 64 | | NPI | 1770511552 |
| Repl bat t.e.n.s. own by pt | | | | | | | | | | | | | | | |
| 09 | 09 | 23 | 09 | 09 | 23 | 12 | | A4630 | NU | ABCD | 5640 | 8 | | NPI | 1770511552 |
| Lead wires, pair | | | | | | | | | | | | | | | |
| 09 | 09 | 23 | 09 | 09 | 23 | 12 | | A4557 | NU | ABCD | 1611 | 1 | | NPI | 1770511552 |
| | | | | | | | | | | | | | | NPI | |
| | | | | | | | | | | | | | | NPI | |
| | | | | | | | | | | | | | | NPI | |

| 25. FEDERAL TAX I.D. NUMBER | SSN EIN | 26. PATIENT'S ACCOUNT NO. | 27. ACCEPT ASSIGNMENT? (For govt. claims, see back) | 28. TOTAL CHARGE | 29. AMOUNT PAID | 30. Rsvd for NUC |
|---|---|---|---|---|---|---|
| ▮▮▮▮▮ | ☐ ☒ | 945528 | ☒ YES ☐ NO | $ 110611 | $ | |

| 31. SIGNATURE OF PHYSICIAN OR SUPPLIER INCLUDING DEGREES OR CREDENTIALS (I certify that the statements on the reverse apply to this bill and are made a part thereof.) | 32. SERVICE FACILITY LOCATION INFORMATION | 33. BILLING PROVIDER INFO & PH # ( 800 ) 495-6670 |
|---|---|---|
| Zynex Medical  332B00000X  _____ 12/28/2023 _____ | Zynex Medical 9655 Maroon Circle Englewood, CO 801125914 a.1770511552  b. | Zynex Medical PO Box 840932 Dallas, TX 752840932 a.1770511552  b.ZZ332B00000X |

---

**Bill**

| | | | |
|---|---|---|---|
| Admit Date: / / | Service Start: / / | Service End: / / |
| FS/UL Allowance: $0.00 | Discharge Status: | DRG Code: |
| Provider Billed: $2232.00 | Provider Billed Date: 04/11/24 | Bill Type: 000 |
| Foreign Bill Control #: 945528 | DCN: 24106943426784607357 | CorVel Recv Date: 04/15/24 |
| Reprice State: | CH Paperwork: WP000282M9L_01 | |
| Contracted Amount: | | |

**Prescribing/Referring Doctor**

| | | |
|---|---|---|
| Name: Madeline M Mayer PA-C | DEA #: | |
| Address: | City: | State: ZIP: |

**UB Fields**

| | | |
|---|---|---|
| Attending: | NPI #: | Non-NPI Qual: #: |
| Operating: | NPI #: | Non-NPI Qual: #: |
| Other Operating: | Discharge Hour: | Admission Hr / Type: / |
| Rendering Prov Taxonomy: | Rend. Prov NPI: | Referring Prov NPI: 1093291494 |

**Diagnosis Code / Admission Indicator**

| | | | | |
|---|---|---|---|---|
| Primary: M47817 | 2: M48061 | 3: M5137 | 4: M5417 | 5: |
| 6 : | 7: | 8: | 9: | 10: |
| 11 : | 12: | 13: | 14: | 15: |
| 16 : | 17: | 18: | 19: | 20: |
| 21 : | 22: | 23: | 24: | Adm Diag Code: |

**Procedure Codes - Dates**

| | | |
|---|---|---|
| Principal: - / / | Second: - / / | Third: - / / |
| Fourth: - / / | Fifth: - / / | Sixth: - / / |

**Compound Drug Fields**

| | | | |
|---|---|---|---|
| Rx Qual: | Rx Date: | Product Qual: | Unit of Measure: | U&C Charge: |
| Cost: | Dispense Fee: | Gross Amt Due: | Net Amt Due: |

**Comments**

-W3 1st Level Appeal

| # | Type | Code | Rev. Code | POS Code | Service Start | Actual Charge | DXR Nbr. | Mod 1 | Mod 2 | Mod 3 | Units | FS/UC Allowance | HCPCS/ Rates |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Contracted Amount | | | | | | | | | | | | | |
| 1 | P | A4595 | | 12 | 09/09/23 | $2232.00 | 1234 | NU | | | 32 | $0.00 | |

Rendering NPI#:  Non-NPI Qual:  Non-NPI#:
Compound Qualifier:  Compound Basis of Cost:
Dispensed:  Original:

247. The Defendants again issued three separate bills for the October 9, 2023 date of service. The first two bills, issued on October 9, 2023 and February 28, 2024, respectively, had fraudulent charges for 64 packages of electrodes ($1,584.00), eight 9-volt batteries ($79.92), and a set of lead wires ($39.00). The third bill, issued on April 11, 2024, used the supplies code (A4595) to bill $2,232.00, but for 21 units compared to the 32 units billed at the same amount the month prior.

248. The Defendants issued two separate bills for the November 9, 2023 date of service. The first bill, issued on November 9, 2023, had fraudulent charges for 64 packages of electrodes ($1,584.00), eight 9-volt batteries ($79.92), and a set of lead wires ($39.00). The second bill, issued March 25, 2024, billed $2,232.00 for 32 units of supplies using code A4595.

249. For the four dates of service from December 9, 2023 through March 9, 2024, the Defendants again billed fraudulent charges for 64 packages of electrodes ($1,584.00), eight 9-volt batteries ($79.92), and a new set of lead wires ($39.00) each month.

250. Each of the bills for J.S. was purportedly based on an order form signed by provider, Madeline Mayer, PA-C, at Aurora Pain Management-Mequon on May 9, 2023.

251. During a visit at Aurora Pain Management-Muskego on February 2, 2024, provider, Caitlin Wiedenhoeft, PA-C, noted that J.S. had a "Zynex TENS unit . . . but doesn't use [it] often." As part of her plan of care at the conclusion of this visit, she encouraged J.S. "to use the Zynex TENS unit more regularly to see if this helps."

252. Upon information and belief, employees of the corporate Defendants did not contact claimants or treatment providers to inquire about claimants' use of the NexWave to determine how many supplies, if any, they needed for any given period prior to the automatic billing and shipment DME supplies.

253. The Defendants billed Allstate for an excessive amount of DME supplies for J.S. that were medically unnecessary. Despite the fact that he did not use the NexWave regularly, the Defendants billed for a total of 2,560 electrodes (640 packages of four), 80 batteries, and ten additional sets of lead wires over the course of ten months.

254. In certain circumstances, the Defendants billed for supplies for the NexWave under A4595, which illustrates both the Defendants' knowledge of A4595, and the differential in the price for bundled and unbundled charges.

255. By way of example, in the case of claimant M.G. (Claim No. 0699170395), the Defendants billed $217.98 for supplies using two units of code A4595 for the November 18, 2023 and December 18, 2023 dates of service, whereas they billed $2,178.00 in October of 2023 when using fraudulent code A4556 to charge separately for 44 packages of electrodes. Accordingly, the Defendants billed $1,960.02 more in October of 2023 than in November or December, for what appear to be the same services, due to fraudulent supply charges. A true and accurate excerpt from the invoice for M.G.'s DME supplies for October through December of 2023 is depicted below.



256.    The inconsistencies in the amounts the Defendants billed Allstate for the same supplies each month, taken together with the sheer volume of supplies billed without the input of licensed medical professionals or claimants, demonstrates that even when the Defendants did use the appropriate code, they were billing for an excessive, and seemingly arbitrary, amount of supplies with no regard for medical necessity or specific claimants' needs.

257.    All of the bills submitted, or caused to be submitted, by the Defendants through the U.S. Mail seeking payment from Allstate for HCPCS codes A4595, A4556, A4557, and A4630 are fraudulent. *See* Exhibits 2-5.

**D.    FRAUDULENT BILLING FOR SERVICES NOT RENDERED**

258.    The Defendants have billed Allstate claimants for DME and supplies that were not rendered as represented, if at all.

259.    Upon information and belief, the Defendants have billed Allstate for DME and supplies that were not provided to claimants.

260.    This fraudulent practice is most apparent in cases like that of claimants, R.P. and D.C. (Claim No. 0697205102), where DME for in-home use is not referenced in any of their treatment records, nor in their deposition testimony when describing their treatment.

261.    Siblings, R.P. and D.C., were in the same vehicle during a motor vehicle accident that occurred on December 24, 2022.

262.    R.P. and D.C. first sought medical treatment with Axel Vargas, M.D. ("Dr. Vargas"), on January 12, 2023 at River North Interventional Pain Management Consultants, S.C. R.P. reported upper and lower back pain that radiated to her buttocks, neck pain, and right shoulder pain. D.C. reported neck pain and lower back pain that radiated to his lower extremities.

263.    At the conclusion of their initial visit, Dr. Vargas recommended physical therapy, back braces and a course of NSAIDs, and prescribed Mobic (Meloxicam), Protonix (Pantoprazole), Flexeril (Cyclobenzaprine), and Gabapentin (Neurotin) to both R.P. and D.C. There are no references to electrical stimulation during this visit.

264.    With Dr. Vargas's referral, R.P. and D.C. presented to ATI Physical Therapy on January 17, 2023 for treatment with McKinley Grove, PT ("Grove"). Grove's assessments and plans of treatment for R.P. and D.C. were identical.

265.    Grove recommended that R.P. and D.C. continue physical therapy three times a week for eight weeks with the following procedures to occur during each visit: therapeutic exercises, manual therapy, neuromuscular re-education, therapeutic activities, "PT Evaluation," cold pack treatment, hot pack treatment, ultrasound, mechanical traction, and in-office electrical stimulation. Grove did not reference electrical stimulation DME for in-home use for R.P. or D.C.

266.    In fact, Grove did not reference electrical stimulation DME for in-home use in any of the records associated with R.P.'s 22 visits or D.C.'s 25 visits at ATI Physical Therapy from January 17, 2023 through March 16, 2023 when they were both discharged.

267.    Zynex Medical subsequently issued a bill for a NexWave device, a set of lead wires, 64 packages of electrodes, and eight 9-volt batteries for D.C., purportedly based on a referral by Grove. The date of service on this bill was March 24, 2023, which is after D.C. was discharged from Grove's care on March 16, 2023 and no longer under his supervision. A true and accurate excerpt from this bill is depicted below.

Case No. 1:26-cv-00914-SKC-TPO   Document 22-5   filed 03/26/26   USDC Colorado
Case 1:25-cv-04915-DLI-CHK   Document 1   filed 09/04/25   Page 70 of 117 PageID #: 70
pg 85 of 132



268.    Similarly, Zynex Medical issued a bill for a NexWave device, a set of lead wires, 64 packages of electrodes, and eight 9-volt batteries for R.P, who resides with D.C. at the same address, purportedly based on a referral by Grove. The date of service on this bill was March 30, 2024, which was after R.P. was discharged from Grove's care on March 16, 2023 and no longer under his supervision. A true and accurate excerpt from this bill is depicted below:

269.     The Defendants justified these bills with order forms for lifetime prescriptions for a NexWave, "monthly supplies," and "a Conductive Garment when applicable," purportedly signed by Grove over two months prior on January 17, 2023, the date of R.P. and D.C.'s first visit at ATI Physical Therapy.

270.     Notably, the diagnostic codes and treatment areas marked off on the order forms are identical for R.P. and D.C. Despite the fact that one of R.P.'s "primary complaint[s]" during the January 17, 2023 visit was shoulder pain, the "shoulder" box is left empty on her order form. A true and accurate sample from R.P.'s order form is depicted below:

Case No. 1:26-cv-00914-SKC-TPO    Document 22-5    filed 03/26/26    USDC Colorado
Case 1:25-cv-04915-DLI-CHK    Document 1-3    Filed 09/04/25    Page 72 of 117 PageID #:
72
pg 87 of 132

[ ] Dr. McKinley Grove, PT, DPT - NPI: 1942781125

R ▉▉ P. ▉▉                                      ▉▉▉▉  12/24/22
PATIENT NAME*                                  DOB*        DATE OF INJURY

▉▉▉▉▉▉
PRIMARY PHONE*                                 SECONDARY PHONE/ EMAIL

INSURANCE TYPE

☐ Work Comp    ☐ TRICARE    ☒ Auto/Attorney/PI    ☐ Commercial    ☐ Medicare/Med
                                                  (e.g.- UHC,BCBS,Cigna,Aetna,etc.)

**E-STIM**

☒  Zynex NexWave + Monthly Supplies and          DX Code(s) M54 . 2    m54 . 59
   a Conductive Garment when applicable
   **Length of Need:** ☐ Life-time ☐ 3-18 Months   Treatment Area: ☒ Neck  ☐ Shoulder ☒ Back
   (if unchecked = Life-time)                                      ☐ Hand ☐ Foot    ☐ Elbo
☐  Zynex E-Wave (NMES Only) + Monthly Supplies                    ☐ Other: _____

         *Substitution for this device is NOT ALLOWED without my written approval*

**BRACING** 🔧  (FILL OUT PATIENT EQUIPMENT PROTOCOL ON BACK OF PATIENT HANDOUT)

☐ Aspen Horizon Lumbosacral Orthosis (Prefabricated) (Purchase Only)   DX Code(s) _____._____
☐ Zynex Pro OA Knee (Prefabricated) (Purchase Only)                    Quantity to be Dispensed: _____
☐ Zynex Pro Post-Op Knee (Prefabricated) (Purchase Only)               Frequency of Use: _____
                                                                       Knee: ☐ Right  ☐ Left
         *Please document in patient's chart the reason(s) for prescribing and fax with Rx*

**CERVICAL TRACTION** 🏋 (FILL OUT PATIENT EQUIPMENT PROTOCOL ON BACK OF PATIENT HANDO

☐ Cervical Traction (Purchase Only) (Saunders or ComforTrac)   DX Code(s) _____._____

**HOT/COLD THERAPY** (FILL OUT PATIENT EQUIPMENT PROTOCOL ON BACK OF PATIENT HANDOUT

☐ JetStream® Hot/Cold circulating pump & therapy blanket
   **Length of Need:** ☐15 Days ☐30 Days ☐45 Days ☐Other ___Days   DX Code(s) _____._____
   *I have reviewed the hot/cold therapy contraindications on the back of this prescription prior to prescribing for*

_M. Kirby_ ⟋ PT.DPT            1/17/23
PRESCRIBER'S SIGNATURE*                    DATE*

271.    Moreover, in-home DME for electrical stimulation was not referenced in any of the medical records associated with R.P. and D.C.'s treatment with other providers after their discharge from ATI Physical Therapy. This absence contravenes any suggestion that a different provider prescribed or was monitoring R.P. and D.C.'s use of DME and supplies.

272.    During their depositions on November 7, 2024, R.P. and D.C. were asked to describe the circumstances surrounding the December 24, 2022 motor vehicle accident and the medical treatment they had received since.

273.    When describing their treatment, neither R.P. or D.C. referenced in-home DME for electrical stimulation. Rather, they described a series of prescription medications, injections, diagnostic imaging, physical examinations, pain-relief patches, and exercises they performed at physical therapy.

274.    D.C. referenced electrical stimulation, but only in the context of describing the treatment administered to him in the physical therapist's office, which is corroborated by the visit notes from ATI Physical Therapy regarding the modalities of treatment administered.

275.    Accordingly, the only documentation or statement that refers to electrical stimulation DME for in-home use is the Defendants' template order form that was purportedly filled out during R.P and D.C.'s first visit with Grove that was used to justify DME and supplies dispensed two months later when R.P. and D.C. were no longer under Grove's care.

276.    The fact that the Defendants only billed for one month of services (March of 2023) despite the January 17, 2023 order form purportedly authorizing a lifetime prescription for monthly supplies suggests that the NexWave devices and supplies were not provided to R.P. and D.C.

277.    Even if the services billed were provided to R.P. and D.C., which they were not, those services were not medically necessary or rendered as was represented to Allstate given the lack of any justification in their medical records and the fact that the claimants had already been discharged from Grove's care when the services were dispensed.

278.    The Defendants also routinely billed Allstate for services not rendered to claimants when they billed separately for supplies such as electrodes, batteries, and lead wires on the initial bill for the shipment of the NexWave device.

279.    As previously discussed, the NexWave device comes with the supplies necessary to use it: two sets of four electrodes, a set of lead wires, at least one 9-volt battery, and an AC power supply cord to use in place of the batteries.

280.    Moreover, the proper codes for TENS devices (E0730) and NMES devices (E0745) include the cost of the initial supplies associated with the unit.

281.    Specifically, codes E0730 and E0745 include lead wires and one month's supply of electrodes, conductive paste or gel if needed, and batteries.

282.    As described above, the Defendants routinely fraudulently charged for the initial supplies on the bills for the shipment of the NexWave device, using separate codes for electrodes (A4556), lead wires (A4557), and batteries (A4630), and a miscellaneous code for the NexWave (E1399).

283.    By adding additional charges on claimants' initial bills for supplies that are included with the device, the Defendants billed for goods that were never provided to Allstate claimants.

284.    Even assuming the Defendants actually provided Allstate claimants with the 64 packages of four electrodes, extra set(s) of lead wires, and eight 9-volt batteries they routinely billed for separately from the NexWave in the first shipment, these supplies were duplicative, medically unnecessary, and arbitrarily provided without regard for individual patients' needs or device usage.

## V.     MATERIAL MISREPRESENTATIONS AND JUSTIFIABLE RELIANCE

### A.     MATERIAL MISREPRESENTATIONS MADE BY DEFENDANTS

285.    The Defendants submitted, or caused to be submitted, documentation that misrepresented and omitted material facts about the billed-for DME and supplies to induce Allstate to pay the fraudulent charges for the unnecessary and unlawful services.

286.    The Defendants' fraudulent scheme involved billing for DME and supplies for the benefit of Allstate claimants, including: (1) billing for DME products based on false representations that the DME was medically necessary and prescribed by a licensed and/or qualified healthcare professional; (2) billing for medically unnecessary replenishment DME supplies that were not prescribed by a physician, unilaterally decided to replenish Allstate claimants' with a "lifetime" supply of DME supplies without proper medical qualifications; (3) billing for DME and supplies pursuant to a predetermined treatment protocol; (4) billing for DME and supplies that were not rendered as represented, if at all; (5) billing grossly excessive fees for DME and supplies; and (6) fraudulently billing for unbundled DME supplies.

287.    The Defendants' invoices were issued on Health Insurance Claim Forms ("CMS-1500 forms"), which are medical billing forms approved by the National Uniform Claim Committee (NUCC).

288.    All CMS-1500 forms submitted, and routinely signed by Sandgaard contained the following warning in bold font: "NOTICE: Any person who knowingly files a statement of claim containing any misrepresentation or any false, incomplete or misleading information may be guilty of a criminal act punishable under law and may be subject to civil penalties."

289.    Moreover, as a participating member in the New York State Medicaid Program, Zynex Medical is subject to the program's "Certification Statement for Providers Billing

Medicaid," wherein it certified, among other things, that "[a]ll care, services and supplies for which claim[s are] made are medically necessary," "ALL STATEMENTS, DATA AND INFORMATION TRANSMITTED ARE TRUE, ACCURATE AND COMPLETE TO THE BEST OF [ITS] KNOWLEDGE; NO MATERIAL FACT HAS BEEN OMITTED," and that it "MAY BE FINED AND/OR PROSECUTED UNDER APPLICABLE FEDERAL AND STATE LAWS FOR ANY VIOLATION OF THE TERMS OF THIS CERTIFICATION, INCLUDING BUT NOT LIMITED TO FALSE CLAIMS, STATEMENTS OR DOCUMENTS, OR CONCEALMENT OF A MATERIAL FACT."

290.    As alleged herein, the Defendants ignored these warnings; instead, they created and submitted a multitude of records and bills on behalf of the corporate Defendants that contained false information.

291.    The Defendants attested to the necessity of the billed services through these records and bills, which the Defendants mailed to Allstate using the U.S. Mail.

292.    Every record and bill created and mailed by the Defendants constitutes a material misrepresentation because the records and bills relate to the corporate Defendants' charges: (1) billing for DME products based on false representations that the DME was medically necessary and prescribed by a licensed and/or qualified healthcare professional; (2) billing for medically unnecessary replenishment DME supplies that were not prescribed by a physician, unilaterally decided to replenish Allstate claimants' with a "lifetime" supply of DME supplies without proper medical qualifications; (3) billing for DME and supplies pursuant to a predetermined treatment protocol; (4) billing for DME and supplies that were not rendered as represented, if at all; (5) billing grossly excessive fees for DME and supplies; and (6) fraudulently billing for unbundled DME supplies.

293.    The Defendants knew, and it was reasonably foreseeable, that patients, or patients' representatives, would submit the Defendants' bills and related documentation through the U.S. Mail when they sought claim-settlement payments from Allstate.

294.    In these instances, documents submitted to Allstate through the U.S. Mail included records, bills, and liens generated by the Defendants with respect to the corporate Defendants.

295.    As part of this scheme, the Defendants intended for Allstate to act in reliance on the statements and representations contained in the records and bills concerning the DME and supplies.

296.    In reasonable reliance on the statements and representations contained in the records and bills, Allstate issued payments in connection with billing from Zynex Medical at the behest of Zynex.

### B.    JUSTIFIABLE RELIANCE BY ALLSTATE

297.    At all relevant times, the Defendants acted with the intent to conceal from Allstate their misconduct in connection with the scheme to defraud.

298.    As the Defendants did not render lawful and reasonably necessary medical treatment, each bill and accompanying documentation mailed by or on behalf of the Defendants to Allstate constitutes a material misrepresentation.

299.    The Defendants submitted, or caused to be submitted, records, and itemized billing statements detailing the services rendered to Allstate claimants.

300.    The Defendants created records, reports, and bills knowing that these documents would be submitted to Allstate in support of settlement demand letters, which contained representations that the services were rendered, lawful, and necessary to address the injuries purportedly suffered by the Allstate claimants.

301. The Defendants knowingly misrepresented and concealed material facts to prevent Allstate from discovering that the Defendants billed Allstate: (1) for DME products based on false representations that the DME was medically necessary and prescribed by a licensed and/or qualified healthcare professional; (2) for medically unnecessary replenishment DME supplies that were not prescribed by a physician, unilaterally decided to replenish Allstate claimants' with a "lifetime" supply of DME supplies without proper medical qualifications; (3) for DME and supplies pursuant to a predetermined treatment protocol; (4) for DME and supplies that were not rendered as represented, if at all; (5) grossly excessive fees for DME and supplies; and (6) fraudulently billing for unbundled DME supplies.

302. Each claim submitted to Allstate by, or on behalf of, the Defendants misrepresented that the Defendants were legally eligible to be reimbursed.

303. Each individual billing statement submitted to Allstate references the date of service(s).

304. The Defendants' records identify the claimants' name, date of loss, date of service, the type of product and service purportedly provided, and the amount billed for each service.

305. The Defendants knowingly misrepresented and concealed material facts to prevent Allstate from discovering the services provided by the Defendants were not lawfully rendered and not compensable under state and federal laws.

306. The Defendants' acts were self-concealing by their very nature.

307. When Allstate receives treatment documentation from a provider, such documentation is reviewed and processed in accordance with the applicable statutes and regulations governing the adjustment of insurance claims.

308. The facially valid documents submitted to Allstate by the Defendants were designed to, and did in fact, induce Allstate to rely on them.

309. Allstate believed the Defendants' bills and records (including the misrepresentations in every claim) and directly relied on those representations when making payments.

310. The Defendants knew that the medical bills that contained false representations would be submitted by claimants and/or their counsel to Allstate seeking payments. Indeed, this was the Defendants' specific intent—that Allstate would believe and rely on these false statements in the Defendants' medical records to induce it to make payments.

311. The sole purpose of the Defendants making material misrepresentations in their medical bills and records was to steal from Allstate.

312. In fact, Allstate was the intended target of the Defendants' fraud scheme. The Defendants' scheme to defraud was not perpetuated against patients, Allstate claimants, or Allstate insureds.

313. Records and invoices are reviewed to determine (1) whether the purported healthcare service is covered; (2) whether coverage exists under the applicable policy of insurance; and (3) the sufficiency of the charged amount under the applicable fee schedule(s).

314. When Allstate receives a settlement demand from a claimant or the claimant's bodily injury attorney, the contents of the demand are analyzed to determine (1) whether coverage exists under the applicable policy of insurance; and (2) whether the claimant's alleged injuries warrant a payment or settlement sufficient to compensate the claimant for the expenses incurred, and any bodily injury suffered as a result of the covered event (i.e., the subject motor vehicle accident).

Case No. 1:26-cv-00913-SKC-TPO    Document 22-5    filed 03/26/26    USDC Colorado
Case 1:25-cv-04915-DLI-CHK    Document 1    filed 09/04/25    Page 80 of 117 PageID #: 80
pg 95 of 132

315. Allstate diligently reviewed each of the Defendants' submissions upon receipt.

316. The Defendants' wrongdoing was not discovered during this period.

317. Given the clandestine nature of the Defendants' scheme, it was impossible for Allstate to discover a clear pattern of misconduct during Allstate's investigation into each discrete insurance claim associated with the Defendants' scheme.

318. Despite its due diligence, Allstate did not discover the Defendants' deception and the resulting injuries caused by such deception until shortly before filing this Complaint.

319. Had Allstate not been misled by the representations contained in the Defendants' documentation and associated settlement demands, no payments would have been made on these claims.

320. The Defendants' scheme was wholly dependent on Allstate relying on their misrepresentations and subsequently making payments based on omissions, and the false information contained within the bills, records, and liens.

## VI.    **SPECIFIC ALLEGATIONS OF MAIL FRAUD RACKETEERING ACTIVITY**

321. The Defendants created, prepared, and submitted false documentation, and intentionally violated the laws of the United States by creating schemes to defraud and obtain money and property by means of false and fraudulent pretenses in representations, and by placing or causing to be placed, in a post office and/or authorized depository for mail documents to be sent and delivered by the United States Postal Service, in violation of 18 U.S.C. § 1341 (mail fraud) for the purpose of executing such fraudulent schemes and attempting to do so.

322. The treatment purportedly provided and billed for by the Defendants was fraudulent because the Defendants billed: (1) for DME products based on false representations that the DME was medically necessary and prescribed by a licensed and/or qualified healthcare professional; (2)

for medically unnecessary replenishment DME supplies that were not prescribed by a physician, unilaterally decided to replenish Allstate claimants' with a "lifetime" supply of DME supplies without proper medical qualifications; (3) for DME and supplies pursuant to a predetermined treatment protocol; (4) for DME and supplies that were not rendered as represented, if at all; (5) grossly excessive fees for DME and supplies; and (6) fraudulently billing for unbundled DME supplies.

323. The Defendants knew that the extent and fact of treatment would be used to inflate and bolster bodily-injury claims submitted to Allstate on behalf of the claimants.

324. The objective of the scheme to defraud Allstate was to collect insurance benefits that the Defendants were not entitled to since the goods dispensed, if at all, were not medically necessary and because the Defendants engaged in fraudulent billing practices.

325. This objective necessarily required the submission of claims to Allstate.

326. The Defendants created, prepared, and submitted false documentation and placed in a post office and/or authorized depository for mail documents to be sent and delivered by the United States Postal Service, and packages sent between states by way of U.S. Mail.

327. Unless otherwise pled to the contrary, all documents, notes, reports, health insurance claim forms, HCPCS code sheets, referrals, prescriptions, patient checklists, letters, and requests for payment in connection with the insurance claims referenced throughout this pleading traveled through the U.S. Mail.

328. Every automobile insurance claim detailed herein involved at least two uses of the U.S. Mail, including the mailing of the notice of claim(s), initial policies, insurance payments, claims settlement checks and the return of the cancelled settlement drafts to the financial

Case No. 1:26-cv-00913-SKC-TPO    Document 22-5    filed 03/26/26    USDC Colorado
Case 1:25-cv-04915-DLI-CHK    Document 1    filed 09/04/25    Page 82 of 117 PageID #: 82
pg 83 of 138

institution(s) from which the draft(s) were drawn, as well as return of settlement draft duplicates to the insurance carrier's home office for filing.

329.    Allstate estimates that the scheme detailed herein generated thousands of mailings. A table listing examples of mailings made in furtherance of this scheme is annexed hereto as Exhibit 7.

330.    The Defendants mailed, or caused the mailing of, documents, including records and bills that materially misrepresented that the Defendants were providing and properly billing for necessary treatment.

331.    The Defendants knew, and it was reasonably foreseeable, that their documents would be mailed to Allstate through the U.S. Mail in support of claims made on patients' behalf, including the representative mailings detailed in Exhibit 7 annexed hereto.

332.    It was within the ordinary course of business for the Defendants to submit claims for reimbursement to insurance carriers like Allstate through the U.S. Mail.

333.    As the Defendants agreed to use (and did in fact use) the mail system in furtherance of their scheme to defraud Allstate by seeking payment for services that are not compensable under the Allstate policies and state law, the Defendants committed mail fraud, as defined in 18 U.S.C. § 1341. A table detailing representative examples of the mail fraud agreed to and perpetrated by these Defendants is annexed hereto as Exhibit 7 and includes specific information regarding the date, the sender, the recipient, and the content of the Defendants' fraudulent mailings.

334.    The representative mailings identified in Exhibit 7 contains misrepresentations of fact regarding the lawfulness, necessity, and fact of the treatment for which Allstate was billed.

335.    Allstate reasonably relied on the submissions it received from, and/or on behalf of, and/or with the knowledge of the Defendants through the U.S. Mail in tendering payment to the Defendants, including those payments detailed in Exhibits 8-9.

336.    Moreover, the patient and/or his/her counsel relied on the Defendants' false statements when pursuing insurance claims.

337.    The Defendants' fraudulent scheme went undetected until Allstate had sustained substantial financial injury. The Defendants' fraudulent scheme was self-concealing by its very nature—false medical records and false invoices appearing legitimate on their face.

338.    As the Defendants agreed to pursue the same criminal objective (namely, mail fraud), they committed a conspiracy within the meaning of the RICO Act 18 U.S.C. § 1962(d) and its Colorado counterpart, COCCA § 18-17-104(4), and are, therefore, jointly and severally liable for Allstate's damages.

## VII.    DAMAGES

339.    The Defendants are sophisticated parties that routinely interact with insurers. As such, the Defendants are keenly familiar with the operation of the insurance industry. The Defendants used this knowledge to defraud Allstate.

340.    The Defendants knew Allstate would rely on the Defendants' false medical documentation when paying claims. They also knew that their false medical documentation would result in much higher payments by Allstate.

341.    The Defendants' pattern of fraudulent conduct injured Allstate in its business and property by reason of the aforesaid violations of federal and state law.

342.    Allstate's injury is the harm caused by the Defendants' pattern of predicate acts (mailing of false documentation).

343. Allstate's damages sought herein are ascertainable and calculable and are not the cause of any independent factors.

344. Allstate's damage was the result of the Defendants' preconceived purpose and the specifically intended consequence of the Defendants' racketeering activity.

345. Allstate is the best person/entity to pursue these damages in this lawsuit.

346. Allstate's injuries are neither remote nor attenuated where Allstate was the primary victim of the Defendants' fraud scheme alleged herein.

347. The patients involved (Allstate claimants) were not victims of the Defendants' pattern of racketeering activity. Arguably, the Allstate claimants benefited by receiving larger payments based on Allstate's reliance on the Defendants' false medical documentation.

348. Indeed, the Defendants used the Allstate claimants and the bodily-injury claim process as vehicles to carry out their fraud scheme.

349. Allstate's damages calculation includes those monies that it paid to Defendants in connection with first-party insurance claims.

350. In addition, Allstate's damage calculation includes monies that it intended would be paid to the Defendants from the payments made to bodily-injury claimants.

351. There is a direct causal relationship between the Defendants' racketeering activity (mailing false medical documentation) and Allstate's damages (the precise amount Allstate considered due and owing to the Defendant Entities when making payments to Defendants or in connection with bodily-injury claims). As such, the Defendants' fraudulent conduct was the proximate cause of the injury suffered by Allstate.

352. Allstate does not seek damages for anything more than what it considered to be due and payable to the Defendants based on its reliance on the Defendants' bills and records.

353.    At the time it made these payments, Allstate was not aware of the fraud scheme alleged herein despite its reasonable due diligence because the Defendants went to great lengths to fraudulently conceal their scheme.

354.    But for the submission of false medical documentation by the Defendants, Allstate would not have paid monies for the Defendants' fraudulent services. As a result, the Defendants' fraudulent claims were the factual cause of the injury suffered by Allstate.

355.    Had Allstate not been misled by the representations contained in the Defendants' documentation, no payments would have been made on these claims.

356.    All of the payments were made based on the Defendants' material misrepresentations.

357.    None of the payments identified in Exhibits 8-9 were for legitimate healthcare goods.

358.    There is a direct relationship between the amount of the Defendants' fraudulent bills and the amount paid to claimants. *See* Exhibits 8-9.

359.    Indeed, Allstate intended and the Defendants did, in fact, receive these payments identified in Exhibits 8-9.

360.    In addition, the Defendants' pattern of fraudulent conduct injured Allstate in its business and property by reason of the aforesaid violations of state and federal law. Although it is not necessary for Allstate to calculate its damages with specificity at this stage of the litigation (where Allstate's damages continue to accrue), Allstate's injury includes, but is not limited to, compensatory damages for payments wrongfully made to the corporate Defendants, in connection with claims made under applicable state laws, the exact amount to be determined at trial, including payments made to Zynex Medical, Inc. by Allstate in connection with first-party claims (totaling

at least $1,786,745.44) as well as monies received by Zynex Medical, Inc. that were derived directly from Allstate's payments tendered in connection with the payment of third-party bodily injury claims (totaling at least $1,221,888.28), the exact amount to be determined at trial. The charts at Exhibits 8-9, incorporated herein as if set forth in their entirety, identify Allstate's first-party payments to Zynex Medical, Inc. in connection with claims determined to be false and fraudulent as of the filing of this Complaint and the monies received by Zynex Medical, Inc. as a direct result of Allstate's payment of third-party claims that have been determined to be fraudulent as of the filing of this Complaint.

## VIII.   CAUSES OF ACTION

### COUNT I
### VIOLATIONS OF 18 U.S.C. § 1962(c)
### ZYNEX, INC. ENTERPRISE
### (Against Zynex Medical, Inc., Thomas Sandgaard, Daniel Moorhead, and Anna Lucsok)

361.   Allstate re-alleges, re-pleads, and incorporates by reference the allegations made in paragraphs 1 through 360 as if set forth fully herein.

362.   As a corporation, Zynex, Inc. ("Zynex") constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

363.   Defendants Zynex Medical, Inc., Thomas Sandgaard, Daniel Moorhead, and Anna Lucsok (collectively, the "Count I Defendants") have, at all relevant times, been "person[s]," as defined by 18 U.S.C. § 1961(3).

364.   The Count I Defendants are each employed by and/or associated with the Zynex enterprise, participating directly or indirectly in the conduct of the enterprise's affairs as required by 18 U.S.C. § 1962(c). Zynex Medical is a subsidiary corporation wholly-owned by Zynex. Sandgaard is the Founder, President, and CEO of Zynex. Moorhead has been the CFO of Zynex since June of 2017, responsible for all finance and accounting functions. Lucsok was previously a

Billing Manager and Vice President of Reimbursement and Sales Operations for Zynex Medical, and has been the COO of Zynex since January of 2021.

365. In furtherance of their operation and management of Zynex, the Count I Defendants repeatedly and intentionally prepared and mailed, caused to be prepared and mailed, knew that such false medical documentation would be mailed, or should have reasonably foreseen the mailing of claim reimbursement documentation in the ordinary course of Zynex's business for medical services purportedly provided by Zynex, which they knew would be submitted to Allstate by Zynex and/or by a personal injury attorney on behalf of a patient, to collect payment from Allstate.

366. The Count I Defendants devised and executed a scheme to defraud Allstate by submitting, or causing to be submitted, misleading and fraudulent records and bills for the sale and distribution of DME and supplies through the U.S. Mail, seeking to collect payment on insurance claims in 47 states and the District of Columbia.

367. The Count I Defendants defrauded Allstate by (1) billing for DME products based on false representations that the DME was medically necessary and prescribed by a licensed and/or qualified healthcare professional; (2) billing for medically unnecessary replenishment DME supplies that were not prescribed by a physician, unilaterally decided to replenish Allstate claimants' with a "lifetime" supply of DME supplies without proper medical qualifications; (3) billing for DME and supplies pursuant to a predetermined treatment protocol; (4) billing for DME and supplies that were not rendered as represented, if at all; (5) billing grossly excessive fees for DME and supplies; and (6) fraudulently billing for unbundled DME supplies.

368.    Had the Count I Defendants refrained from participating, directly or indirectly, in the scheme to defraud Allstate, then Zynex Medical would not have been able to successfully submit false records and bills to Allstate for the benefit of the Zynex enterprise.

369.    The mail fraud racketeering activity are related where the predicate acts served the same purpose of defrauding Allstate by submitting false medical documentation through the U.S. Mail to induce Allstate to rely on the Count I Defendants' misrepresentations to make payments for the benefit of the Zynex enterprise.

370.    The Count I Defendants' repeated predicate acts occurred over a substantial period of time exceeding years before being detected by Allstate as fraudulent.

371.    Allstate would not have allocated payments for the medical bills submitted for the benefit of the Zynex enterprise if it knew that the Count I Defendants' medical documentation was fraudulent.

372.    The Count I Defendants employed two (2) or more mailings to demand and/or receive payment for the benefit of the Zynex enterprise on certain dates, including, but not limited to, those dates identified in the chart at Exhibit 7.

373.    Among other things, the Count I Defendants sent, or caused to be sent, documents, notes, invoices, liens, prescription forms, letters of medical necessity, health insurance claim forms, and other documents, letters, and/or requests for payment for the benefit of the Zynex enterprise that were routinely delivered to Allstate through the U.S. Mail.

374.    By mailing numerous fraudulent claim-related documents in furtherance of an ongoing scheme, the Count I Defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

375.    The Count I Defendants shipped, or caused to be shipped, DME and supplies to Allstate claimants through the U.S. Mail in 47 states and the District of Columbia.

376.    Payments made by Allstate for the benefit of the Zynex enterprise were delivered through the U.S. Mail.

377.    As documented above, the Count I Defendants repeatedly and intentionally submitted, or caused to be submitted, invoices and other claim-related documentation to Allstate related to the DME, supplies, and services provided by the Zynex enterprise for collecting payment from Allstate under the medical expense and bodily-injury portion of the Allstate policies and applicable state laws.

378.    In reasonable reliance upon the mailing and/or submission of those misleading documents and materially false representations, Allstate, by its agents and employees, issued payments for the benefit of the Count I Defendants that would not otherwise have been paid.

379.    The Count I Defendants' pattern of preparing and mailing, or causing and/or directing the preparation and mailing of, these documents and other claim-related materials, each appearing legitimate on their face, also prevented Allstate from discovering this scheme for a significant period of time, thus enabling the Count I Defendants to continue perpetrating this scheme undetected.

380.    The facts set forth above constitute indictable offenses according to 18 U.S.C. § 1341 (mail fraud).

381.    The activities alleged in this case had the direct effect of causing funds to be transferred from Allstate to the Zynex enterprise for the benefit of the Count I Defendants.

382.    Allstate is in the business of writing insurance and paying claims in the 47 states and the District of Columbia. Insurance fraud schemes practiced in these jurisdictions have a harmful impact on Allstate's overall financial well-being, and adversely affect insurance rates.

383.    The Count I Defendants associated with the foregoing enterprise and participated—directly and indirectly—in the conduct of this enterprise through a pattern of racketeering activities.

384.    Allstate is a "person" as defined by 18 U.S.C. § 1961(3) injured in its business or property due to the Count I Defendants' conduct.

385.    The Count I Defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

386.    Due to the Count I Defendants' violations of 18 U.S.C. § 1962(c), Allstate is entitled to recover three (3) times the damages sustained as a result of the claims submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorneys' fees.

**COUNT II**
**VIOLATIONS OF 18 U.S.C. § 1962(d)**
**ZYNEX, INC. ENTERPRISE**
**(Against Zynex Medical, Inc., Thomas Sandgaard, Daniel Moorhead, and Anna Lucsok)**

387.    Allstate re-alleges, re-pleads, and incorporates by reference all paragraphs set forth above in paragraphs 1 through 360 as if set forth fully in this section.

388.    Through their participation in the operation and management of Zynex, Inc. ("Zynex"), Zynex Medical, Inc., Sandgaard, Moorhead, and Lucsok (collectively the "Count II Defendants") conspired with each other to violate 18 U.S.C. § 1962(c) in violation of 18 U.S.C. § 1962(d).

389.    The Count II Defendants each agreed to participate in a conspiracy to violate 18 U.S.C. § 1962(c) by agreeing to conduct the affairs of Zynex through a pattern of racketeering activity, including numerous acts of mail fraud as set forth in Exhibit 7, and through the preparation and/or submission of fraudulent insurance claim documents to Allstate.

390.    The purpose of this conspiracy was to obtain payments from Allstate on behalf of the Zynex enterprise, even though Zynex, because of the Count II Defendants' unlawful conduct, was not eligible to collect such payments.

391.    The Count II Defendants were aware of this purpose, and agreed to take steps to meet the conspiracy's objectives, including, but not limited to, the creation, or directing the creation, of insurance claim documents containing material misrepresentations and/or material omissions.

392.    Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make claim payments as a result of the Defendants' unlawful conduct described herein.

393.    By violating 18 U.S.C. § 1962(d), the Count II Defendants are jointly and severally liable to Allstate, and Allstate is entitled to recover from each of the Defendants identified, three (3) times the damages sustained by reason of the claims submitted by the Defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorneys' fees.

### COUNT III
### VIOLATIONS OF 18 U.S.C. § 1962(c)
### ZYNEX MEDICAL, INC. ENTERPRISE
**(Against Zynex, Inc., Thomas Sandgaard, Daniel Moorhead, and Anna Lucsok)**

394.    Allstate re-alleges, re-pleads, and incorporates by reference the allegations made in paragraphs 1 through 360 as if set forth fully herein.

395.    As a corporation, Zynex Medical, Inc. ("Zynex Medical") constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

396.    Defendants Zynex, Inc., Thomas Sandgaard, Daniel Moorhead, and Anna Lucsok (collectively, the "Count III Defendants") have, at all relevant times, been "person[s]," as defined by 18 U.S.C. § 1961(3).

397.    The Count III Defendants are each employed by and/or associated with the Zynex Medical enterprise, participating directly or indirectly in the conduct of the enterprise's affairs as required by 18 U.S.C. § 1962(c). Zynex is the parent company that owns Zynex Medical, and shares the same principal place of business and headquarters. Sandgaard is the Founder, President, and CEO of Zynex Medical. Moorhead has been the CFO of Zynex since June of 2017, responsible for all finance and accounting functions. Lucsok was previously a Billing Manager and Vice President of Reimbursement and Sales Operations for Zynex Medical, and has been the COO of Zynex since January of 2021.

398.    In furtherance of their operation and management of Zynex Medical, the Count III Defendants repeatedly and intentionally prepared and mailed, caused to be prepared and mailed, knew that such false medical documentation would be mailed, or should have reasonably foreseen the mailing of claim reimbursement documentation in the ordinary course of Zynex Medical's business for DME devices and supplies purportedly provided by Zynex Medical, which they knew would be submitted to Allstate by Zynex Medical and/or by a personal injury attorney on behalf of a patient, to collect payment from Allstate.

399.    The Count III Defendants devised and executed a scheme to defraud Allstate by submitting, or causing to be submitted, misleading and fraudulent records and bills for the sale and

distribution of DME and supplies through the U.S. Mail, seeking to collect payment on insurance claims in 47 states and the District of Columbia.

400.    The Count III Defendants defrauded Allstate by (1) billing for DME products based on false representations that the DME was medically necessary and prescribed by a licensed and/or qualified healthcare professional; (2) billing for medically unnecessary replenishment DME supplies that were not prescribed by a physician, unilaterally decided to replenish Allstate claimants' with a "lifetime" supply of DME supplies without proper medical qualifications; (3) billing for DME and supplies pursuant to a predetermined treatment protocol; (4) billing for DME and supplies that were not rendered as represented, if at all; (5) billing grossly excessive fees for DME and supplies; and (6) fraudulently billing for unbundled DME supplies.

401.    Had the Count III Defendants refrained from participating, directly or indirectly, in the scheme to defraud Allstate, then Zynex Medical would not have been able to successfully submit false records and bills to Allstate.

402.    The mail fraud racketeering activity are related where the predicate acts served the same purpose of defrauding Allstate by submitting false medical documentation through the U.S. Mail to induce Allstate to rely on the Count III Defendants' misrepresentations to make payments to Zynex Medical.

403.    The Count III Defendants' repeated predicate acts occurred over a substantial period of time exceeding years before being detected by Allstate as fraudulent.

404.    Allstate would not have allocated payments for Zynex Medical's medical bills if it knew that the Count III Defendants' medical documentation was fraudulent.

405.    The Count III Defendants employed two (2) or more mailings to demand and/or receive payment on certain dates, including, but not limited to, those dates identified in the chart at Exhibit 7.

406.    Among other things, the Count III Defendants sent, or caused to be sent, documents, notes, invoices, liens, prescription forms, letters of medical necessity, health insurance claim forms, and other documents, letters, and/or requests for payment that were routinely delivered to Allstate through the U.S. Mail.

407.    By mailing numerous fraudulent claim-related documents in furtherance of an ongoing scheme, the Count III Defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

408.    The Count III Defendants shipped, or caused to be shipped, DME and supplies to Allstate claimants through the U.S. Mail in 47 states and the District of Columbia.

409.    Payments made by Allstate were delivered through the U.S. Mail.

410.    As documented above, the Count III Defendants repeatedly and intentionally submitted, or caused to be submitted, invoices and other claim-related documentation to Allstate related to the DME, supplies, and services provided by Zynex Medical for collecting payment from Allstate under the medical expense and bodily-injury portion of the Allstate policies and applicable state laws.

411.    In reasonable reliance upon the mailing and/or submission of those misleading documents and materially false representations, Allstate, by its agents and employees, issued payments for the benefit of the Count III Defendants that would not otherwise have been paid.

412.    The Count III Defendants' pattern of preparing and mailing, or causing and/or directing the preparation and mailing of, these documents and other claim-related materials, each

appearing legitimate on their face, also prevented Allstate from discovering this scheme for a significant period of time, thus enabling the Count III Defendants to continue perpetrating this scheme undetected.

413. The facts set forth above constitute indictable offenses according to 18 U.S.C. § 1341 (mail fraud).

414. The activities alleged in this case had the direct effect of causing funds to be transferred from Allstate to Zynex Medical for the benefit of the Count III Defendants.

415. Allstate is in the business of writing insurance and paying claims in the 47 states and the District of Columbia. Insurance fraud schemes practiced in these jurisdictions have a harmful impact on Allstate's overall financial well-being, and adversely affect insurance rates.

416. The Count III Defendants associated with the foregoing enterprise and participated—directly and indirectly—in the conduct of this enterprise through a pattern of racketeering activities.

417. Allstate is a "person" as defined by 18 U.S.C. § 1961(3) injured in its business or property due to the Count III Defendants' conduct.

418. The Count III Defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

419. Due to the Count III Defendants' violations of 18 U.S.C. § 1962(c), Allstate is entitled to recover three (3) times the damages sustained as a result of the claims submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorneys' fees.

## COUNT IV
## VIOLATIONS OF 18 U.S.C. § 1962(d)
## ZYNEX MEDICAL, INC. ENTERPRISE
## (Against Zynex, Inc., Thomas Sandgaard, Daniel Moorhead, and Anna Lucsok)

420.    Allstate re-alleges, re-pleads, and incorporates by reference all paragraphs set forth above in paragraphs 1 through 360 as if set forth fully in this section.

421.    Through their participation in the operation and management of Zynex Medical, Inc. ("Zynex Medical"), Zynex, Sandgaard, Moorhead, and Lucsok (collectively the "Count IV Defendants") conspired with each other to violate 18 U.S.C. § 1962(c) in violation of 18 U.S.C. § 1962(d).

422.    The Count IV Defendants each agreed to participate in a conspiracy to violate 18 U.S.C. § 1962(c) by agreeing to conduct the affairs of Zynex Medical through a pattern of racketeering activity, including numerous acts of mail fraud as set forth in Exhibit 7, and through the preparation and/or submission of fraudulent insurance claim documents to Allstate.

423.    The purpose of this conspiracy was to obtain payments from Allstate on behalf of Zynex Medical, even though Zynex Medical, because of the Count IV Defendants' unlawful conduct, was not eligible to collect such payments.

424.    The Count IV Defendants were aware of this purpose, and agreed to take steps to meet the conspiracy's objectives, including, but not limited to, the creation, or directing the creation, of insurance claim documents containing material misrepresentations and/or material omissions.

425.    Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make claim payments as a result of the Defendants' unlawful conduct described herein.

426.    By violating 18 U.S.C. § 1962(d), the Count IV Defendants are jointly and severally liable to Allstate, and Allstate is entitled to recover from each of the Defendants identified, three (3) times the damages sustained by reason of the claims submitted by the Defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorneys' fees.

**COUNT V**
**VIOLATIONS OF C.R.S. § 18-17-104(3)**
**ZYNEX, INC. ENTERPRISE**
**(Against Zynex Medical, Inc., Thomas Sandgaard, Daniel Moorhead, and Anna Lucsok)**

427.    Allstate re-alleges, re-pleads, and incorporates by reference all paragraphs set forth above in paragraphs 1 through 360 as if set forth fully in this section.

428.    As a corporation, Zynex has, at all relevant times, constituted an "enterprise" as defined in C.R.S. § 18-17-103(2).

429.    Zynex's principal place of business and headquarters is located in Englewood, CO.

430.    Defendants Zynex Medical, Inc., Sandgaard, Moorhead, and Lucsok (collectively, the "Count V Defendants") have, at all relevant times, been "person[s]" as defined by C.R.S. § 18-17-103(4).

431.    The Count V Defendants are each employed by and/or associated with the Zynex enterprise as required by C.R.S. § 18-17-104(3). Zynex Medical is a subsidiary corporation wholly-owned by Zynex. Sandgaard is the Founder, President, and CEO of Zynex. Moorhead has been the CFO of Zynex since June of 2017, responsible for all finance and accounting functions. Lucsok was previously a Billing Manager and Vice President of Reimbursement and Sales Operations for Zynex Medical, and has been the COO of Zynex since January of 2021.

432.    Through the conduct complained of herein, the Count V Defendants have knowingly participated, directly or indirectly, in the Zynex enterprise through a "pattern of racketeering activity" as defined in C.R.S. §§ 18-17-103(3) and 18-17-103(5)(a), including, but

not limited to, at least two (2) acts that constitute the commission, attempted commission, and/or conspiracy to commit mail fraud as defined in 18 U.S.C. § 1341.

433.    In furtherance of their operation and management of Zynex, the Count V Defendants repeatedly and intentionally prepared and mailed, caused to be prepared and mailed, knew that such false medical documentation would be mailed, or should have reasonably foreseen the mailing of claim reimbursement documentation in the ordinary course of Zynex's business for medical services purportedly provided by Zynex Medical, which they knew would be submitted to Allstate by Zynex Medical and/or by a personal injury attorney on behalf of a patient, to collect payment from Allstate.

434.    The Count V Defendants devised and executed a scheme to defraud Allstate by submitting, or causing to be submitted, misleading and fraudulent records and bills for the sale and distribution of DME and supplies through the U.S. Mail, seeking to collect payment on insurance claims in 47 different states and the District of Columbia.

435.    The Count V Defendants defrauded Allstate by (1) billing for DME products based on false representations that the DME was medically necessary and prescribed by a licensed and/or qualified healthcare professional; (2) billing for medically unnecessary replenishment DME supplies that were not prescribed by a physician, unilaterally decided to replenish Allstate claimants' with a "lifetime" supply of DME supplies without proper medical qualifications; (3) billing for DME and supplies pursuant to a predetermined treatment protocol; (4) billing for DME and supplies that were not rendered as represented, if at all; (5) billing grossly excessive fees for DME and supplies; and (6) fraudulently billing for unbundled DME supplies.

436.    Had the Count V Defendants refrained from participating, directly or indirectly, in the scheme to defraud Allstate, then Zynex Medical would not have been able to successfully submit false records and bills to Allstate for the benefit of the Zynex enterprise.

437.    The mail fraud racketeering activity are related where the predicate acts served the same purpose of defrauding Allstate by submitting false medical documentation through the U.S. Mail to induce Allstate to rely on the Count V Defendants' misrepresentations to make payments for the benefit of the Zynex enterprise.

438.    The Count V Defendants' repeated predicate acts occurred over a substantial period of time exceeding years before being detected by Allstate as fraudulent.

439.    Allstate would not have allocated payments for the medical bills submitted for the benefit of the Zynex enterprise if it knew that the Count V Defendants' medical documentation was fraudulent.

440.    The Count V Defendants employed two (2) or more mailings to demand and/or receive payment for the benefit of the Zynex enterprise on certain dates, including, but not limited to, those dates identified in the chart at Exhibit 7.

441.    Among other things, the Count V Defendants sent, or caused to be sent, documents, notes, invoices, liens, prescription forms, letters of medical necessity, health insurance claim forms, and other documents, letters, and/or requests for payment for the benefit of the Zynex enterprise that were routinely delivered to Allstate through the U.S. Mail.

442.    By mailing numerous fraudulent claim-related documents in furtherance of an ongoing scheme, the Count V Defendants engaged in a pattern of racketeering activity within the meaning of C.R.S. § 18-17-104(3).

443. The Count V Defendants shipped, or caused to be shipped, DME and supplies to Allstate Claimants through the U.S. Mail in 47 states and the District of Columbia.

444. Payments made by Allstate for the benefit of the Zynex enterprise were delivered through the U.S. Mail.

445. As documented above, the Count V Defendants repeatedly and intentionally submitted, or caused to be submitted, invoices and other claim-related documentation to Allstate related to the DME, supplies, and services provided by the Zynex enterprise for collecting payment from Allstate under the medical expense and bodily-injury portion of the Allstate policies and applicable state laws.

446. In reasonable reliance upon the mailing and/or submission of those misleading documents and materially false representations, Allstate, by its agents and employees, issued payments for the benefit of the Count V Defendants that would not otherwise have been paid.

447. The Count V Defendants' pattern of preparing and mailing, or causing and/or directing the preparation and mailing of, these documents and other claim-related materials, each appearing legitimate on their face, also prevented Allstate from discovering this scheme for a significant period of time, thus enabling the Count V Defendants to continue perpetrating this scheme undetected.

448. The facts set forth above constitute indictable offenses according to 18 U.S.C. § 1341 (mail fraud), which constitutes racketeering activity pursuant to C.R.S. § 18-17-103(5)(a) of the Colorado Organized Crime Control Act.

449. Allstate is in the business of writing insurance and paying claims in the 47 pertinent states and the District of Columbia. Insurance fraud schemes practiced in these jurisdictions have a harmful impact on Allstate's overall financial well-being, and adversely affect insurance rates.

Case No. 1:26-cv-00913-SKC-TPO    Document 22-5    filed 03/26/26    USDC Colorado
Case 1:25-cv-04915-DLI-CHK    Document 22-5    Filed 09/04/25    Page 101 of 117 PageID
#: 101

450.    Allstate is a "person" as defined by C.R.S. § 18-17-103(4), injured in its business or property due to the Count V Defendants' conduct.

451.    The activities alleged in this case had the direct effect of causing funds to be transferred from Allstate to the Zynex enterprise for the benefit of the Count V Defendants. The Count V Defendants' conduct in violation of C.R.S. § 18-17-104(3) was the direct and proximate cause of Allstate's injury.

452.    By means of the Count V Defendants' violations of C.R.S. § 18-17-104(3), Allstate is entitled to recover three (3) times the damages sustained by reason of the claims submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorneys' fees.

## COUNT VI
## VIOLATIONS OF C.R.S. § 18-17-104(4)
## ZYNEX, INC. ENTERPRISE
**(Against Zynex Medical, Inc., Thomas Sandgaard, Daniel Moorhead, and Anna Lucsok)**

453.    Allstate re-alleges, re-pleads, and incorporates by reference all paragraphs set forth above in paragraphs 1 through 360 as if set forth fully in this section.

454.    Through their participation in the operation and management of Zynex, Inc. ("Zynex"), Zynex Medical, Inc., Sandgaard, Moorhead, and Lucsok (collectively, the "Count VI Defendants") conspired with each other to violate C.R.S. § 18-17-104(3) in violation of C.R.S. § 18-17-104(4).

455.    The Count VI Defendants each agreed to participate in a conspiracy to violate C.R.S. § 18-17-104(3) by agreeing to conduct the affairs of Zynex through a pattern of racketeering activity, including numerous acts of mail fraud as set forth in Exhibit 7, and through the preparation and/or submission of fraudulent insurance claim documents to Allstate.

Case No. 1:26-cv-00913-SKC-TPO   Document 32-5   filed 03/26/26   USDC Colorado
Case 1:25-cv-04915-DLI-CHK   Document 103 of 138d 09/04/25   Page 102 of 117 PageID
#: 102

456.    The purpose of this conspiracy was to obtain payments from Allstate on behalf of the Zynex enterprise, even though Zynex, because of the Count VI Defendants' unlawful conduct, was not eligible to collect such payments.

457.    The Count VI Defendants were aware of this purpose, and agreed to take steps to meet the conspiracy's objectives, including, but not limited to, the creation, or directing the creation, of insurance claim documents containing material misrepresentations and/or material omissions.

458.    Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make claim payments as a result of the Defendants' unlawful conduct described herein.

459.    By violating C.R.S. § 18-17-104(4), the Count VI Defendants are jointly and severally liable to Allstate, and Allstate is entitled to recover from each of the Defendants identified, three (3) times the damages sustained by reason of the claims submitted by the Defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorneys' fees

**COUNT VII**
**VIOLATIONS OF C.R.S. § 18-17-104(3)**
**ZYNEX MEDICAL, INC. ENTERPRISE**
**(Against Zynex, Inc., Thomas Sandgaard, Daniel Moorhead, and Anna Lucsok)**

460.    Allstate re-alleges, re-pleads, and incorporates by reference all paragraphs set forth above in paragraphs 1 through 360 as if set forth fully in this section.

461.    As a corporation, Zynex Medical has, at all relevant times, constituted an "enterprise" as defined in C.R.S. § 18-17-103(2).

462.    Zynex Medical is incorporated under the laws of Colorado, with its principal place of business and headquarters located in Englewood, CO.

- 102 -

Case No. 1:26-cv-00913-SKC-TPO    Document 22-5    filed 03/26/26    USDC Colorado
Case 1:25-cv-04915-DLI-CHK    Document 22-5 filed 09/04/25    Page 103 of 117 PageID
#: 103

463.    Defendants Zynex, Sandgaard, Moorhead, and Lucsok (collectively, the "Count VII Defendants") have, at all relevant times, been "person[s]" as defined by C.R.S. § 18-17-103(4).

464.    The Count VII Defendants are each employed by and/or associated with the Zynex Medical enterprise as required by C.R.S. § 18-17-104(3). Zynex is the parent company that owns Zynex Medical, and shares the same principal place of business and headquarters. Sandgaard is the Founder, President, and CEO of Zynex Medical. Moorhead has been the CFO of Zynex since June of 2017, responsible for all finance and accounting functions. Lucsok was previously a Billing Manager and Vice President of Reimbursement and Sales Operations for Zynex Medical, and has been the COO of Zynex since January of 2021.

465.    Through the conduct complained of herein, the Count VII Defendants have knowingly participated, directly or indirectly, in the Zynex Medical enterprise through a "pattern of racketeering activity" as defined in C.R.S. §§ 18-17-103(3) and 18-17-103(5)(a), including, but not limited to, at least two (2) acts that constitute the commission, attempted commission, and/or conspiracy to commit mail fraud as defined in 18 U.S.C. § 1341.

466.    In furtherance of their operation and management of Zynex Medical, the Count VII Defendants repeatedly and intentionally prepared and mailed, caused to be prepared and mailed, knew that such false medical documentation would be mailed, or should have reasonably foreseen the mailing of claim reimbursement documentation in the ordinary course of Zynex Medical's business for medical services purportedly provided by Zynex Medical, which they knew would be submitted to Allstate by Zynex Medical and/or by a personal injury attorney on behalf of a patient, to collect payment from Allstate.

467.    The Count VII Defendants devised and executed a scheme to defraud Allstate by submitting, or causing to be submitted, misleading and fraudulent records and bills for the sale and

Case No. 1:26-cv-00913-SKC-TPO    Document 22-5    filed 03/26/26    USDC Colorado
Case 1:25-cv-04915-DLI-CHK    Document 1    pg 105 of 138    Filed 09/04/25    Page 104 of 117 PageID
#: 104

distribution of DME and supplies through the U.S. Mail, seeking to collect payment on insurance claims in 47 different states and the District of Columbia.

468.    The Count VII Defendants defrauded Allstate by (1) billing for DME products based on false representations that the DME was medically necessary and prescribed by a licensed and/or qualified healthcare professional; (2) billing for medically unnecessary replenishment DME supplies that were not prescribed by a physician, unilaterally decided to replenish Allstate claimants' with a "lifetime" supply of DME supplies without proper medical qualifications; (3) billing for DME and supplies pursuant to a predetermined treatment protocol; (4) billing for DME and supplies that were not rendered as represented, if at all; (5) billing grossly excessive fees for DME and supplies; and (6) fraudulently billing for unbundled DME supplies.

469.    Had the Count VII Defendants refrained from participating, directly or indirectly, in the scheme to defraud Allstate, then Zynex Medical would not have been able to successfully submit false records and bills to Allstate.

470.    The mail fraud racketeering activity are related where the predicate acts served the same purpose of defrauding Allstate by submitting false medical documentation through the U.S. Mail to induce Allstate to rely on the Count VII Defendants' misrepresentations to make payments to Zynex Medical.

471.    The Count VII Defendants' repeated predicate acts occurred over a substantial period of time exceeding years before being detected by Allstate as fraudulent.

472.    Allstate would not have allocated payments for Zynex Medical's medical bills if it knew that the Count VII Defendants' medical documentation was fraudulent.

Case No. 1:25-cv-00913-SKC-TPO   Document 22-5   filed 03/26/26   USDC Colorado
Case 1:25-cv-04915-DLI-CHK   Document 1   Filed 09/04/25   Page 105 of 117 PageID
#: 105

473.   The Count VII Defendants employed two (2) or more mailings to demand and/or receive payment on certain dates, including, but not limited to, those dates identified in the chart at Exhibit 7.

474.   Among other things, the Count VII Defendants sent, or caused to be sent, documents, notes, invoices, liens, prescription forms, letters of medical necessity, health insurance claim forms, and other documents, letters, and/or requests for payment that were routinely delivered to Allstate through the U.S. Mail.

475.   By mailing numerous fraudulent claim-related documents in furtherance of an ongoing scheme, the Count VII Defendants engaged in a pattern of racketeering activity within the meaning of C.R.S. § 18-17-104(3).

476.   The Count VII Defendants shipped, or caused to be shipped, DME and supplies to Allstate Claimants through the U.S. Mail in 47 states and the District of Columbia.

477.   Payments made by Allstate to Zynex Medical were delivered through the U.S. Mail.

478.   As documented above, the Count VII Defendants repeatedly and intentionally submitted, or caused to be submitted, invoices and other claim-related documentation to Allstate related to the DME, supplies, and services provided by Zynex Medical for collecting payment from Allstate under the medical expense and bodily-injury portion of the Allstate policies and applicable state laws.

479.   In reasonable reliance upon the mailing and/or submission of those misleading documents and materially false representations, Allstate, by its agents and employees, issued payments for the benefit of the Count VII Defendants that would not otherwise have been paid.

480.   The Count VII Defendants' pattern of preparing and mailing, or causing and/or directing the preparation and mailing of, these documents and other claim-related materials, each

Case No. 1:26-cv-00913-SKC-TPO   Document 22-5   filed 03/26/26   USDC Colorado
Case 1:25-cv-04915-DLI-CHK   Document 1   Filed 09/04/25   Page 106 of 117 PageID
#: 106

appearing legitimate on their face, also prevented Allstate from discovering this scheme for a significant period of time, thus enabling the Count VII Defendants to continue perpetrating this scheme undetected.

481.    The facts set forth above constitute indictable offenses according to 18 U.S.C. § 1341 (mail fraud), which constitutes racketeering activity pursuant to C.R.S. § 18-17-103(5)(a) of the Colorado Organized Crime Control Act.

482.    Allstate is in the business of writing insurance and paying claims in the 47 pertinent states and the District of Columbia. Insurance fraud schemes practiced in these jurisdictions have a harmful impact on Allstate's overall financial well-being, and adversely affect insurance rates.

483.    Allstate is a "person" as defined by C.R.S. § 18-17-103(4), injured in its business or property due to the Count VII Defendants' conduct.

484.    The activities alleged in this case had the direct effect of causing funds to be transferred from Allstate to Zynex Medical for the benefit of the Count VII Defendants. The Count VII Defendants' conduct in violation of C.R.S. § 18-17-104(3) was the direct and proximate cause of Allstate's injury.

485.    By means of the Count VII Defendants' violations of C.R.S. § 18-17-104(3), Allstate is entitled to recover three (3) times the damages sustained by reason of the claims submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorneys' fees.

**COUNT VIII**
**VIOLATIONS OF C.R.S. § 18-17-104(4)**
**ZYNEX MEDICAL, INC. ENTERPRISE**
**(Against Zynex, Inc., Thomas Sandgaard, Daniel Moorhead, and Anna Lucsok)**

486.    Allstate re-alleges, re-pleads, and incorporates by reference all paragraphs set forth above in paragraphs 1 through 360 as if set forth fully in this section.

Case No. 1:26-cv-00913-SKC-TPO   Document 22-5   filed 03/26/26   USDC Colorado
Case 1:25-cv-04915-DLI-CHK   Document 1   Filed 09/04/25   Page 107 of 117 PageID
#: 107
pg 108 of 118

487.    Through their participation in the operation and management of Zynex Medical, Zynex, Sandgaard, Moorhead, and Lucsok (collectively the "Count VIII Defendants") conspired with each other to violate C.R.S. § 18-17-104(3) in violation of C.R.S. § 18-17-104(4).

488.    The Count VIII Defendants each agreed to participate in a conspiracy to violate C.R.S. § 18-17-104(3) by agreeing to conduct the affairs of Zynex Medical through a pattern of racketeering activity, including numerous acts of mail fraud as set forth in Exhibit 7, and through the preparation and/or submission of fraudulent insurance claim documents to Allstate.

489.    The purpose of the conspiracy was to obtain payments from Allstate on behalf of Zynex Medical, even though Zynex Medical, because of the Count VIII Defendants' unlawful conduct, was not eligible to collect such payments.

490.    The Count VIII Defendants were aware of this purpose, and agreed to take steps to meet the conspiracy's objectives, including, but not limited to, the creation of insurance claim documents containing material misrepresentations and/or material omissions.

491.    Allstate has been injured in its business and property by reason of this conspiratorial conduct such that Allstate has been induced to make claim payments as a result of the Defendants' unlawful conduct described herein.

492.    By violating C.R.S. § 18-17-104(4), the Count VIII Defendants are jointly and severally liable to Allstate, and Allstate is entitled to recover from each of the Defendants identified, three (3) times the damages sustained by reason of the claims submitted by the Defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorneys' fees.

Case No. 1:26-cv-00913-SKC-TPO   Document 22-5   filed 03/26/26   USDC Colorado
Case 1:25-cv-04915-DLI-CHK   Document 11   Filed 09/04/25   Page 108 of 117 PageID #: 108
pg 109 of 138

## COUNT IX
## NEW YORK COMMON-LAW FRAUD
### (Against All Defendants)

493. Allstate re-alleges, re-pleads, and incorporates by reference all paragraphs set forth above in paragraphs 1 through 360 as if set forth fully in this section.

494. Zynex, Inc., Zynex Medical, Inc., Thomas Sandgaard, Daniel Moorhead, and Anna Lucsok (collectively, the "Count IX Defendants") committed fraud by, among other things, (1) billing for DME products based on false representations that the DME was medically necessary and prescribed by a licensed and/or qualified healthcare professional; (2) billing for medically unnecessary replenishment DME supplies that were not prescribed by a physician, unilaterally decided to replenish Allstate claimants' with a "lifetime" supply of DME supplies without proper medical qualifications; (3) billing for DME and supplies pursuant to a predetermined treatment protocol; (4) billing for DME and supplies that were not rendered as represented, if at all; (5) billing grossly excessive fees for DME and supplies; and (6) fraudulently billing for unbundled DME supplies with the knowledge that such DME and supplies were not lawfully reimbursable under New York law.

495. The Count IX Defendants' scheme to defraud Allstate was dependent upon a succession of misrepresentations and omissions of material fact related to the corporate Defendants' eligibility for and entitlement to reimbursement under New York law.

496. The Count IX Defendants' misrepresentations and omissions of material fact were conveyed through statements made in the corporate Defendants' records, documents, notes, reports, invoices, prescription forms, health insurance claim forms, letters of medical necessity, and other documents, letters, and/or requests for payment.

Case No. 1:26-cv-00913-SKC-TPO    Document 22-5    filed 03/26/26    USDC Colorado
Case 1:25-cv-04915-DLI-CHK    Document 3    Filed 09/04/25    Page 109 of 117 PageID
pg 120 of 138
#: 109

497.    The Count IX Defendants' statements and representations were false, or required

the disclosure of additional facts to render the documents, information, and materials furnished not

misleading.

498.    The Count IX Defendants knew that Allstate would rely on the corporate

Defendants' documents when deciding to pay claims, so they intentionally misrepresented or

omitted material facts to induce Allstate into making payment on the claims.

499.    Allstate's damages include, but are not necessarily limited to, the total amount

actually paid by Allstate in connection with the Count IX Defendants' false claims

($3,008,633.72).

**COUNT X**
**NEW YORK UNJUST ENRICHMENT**
**(Against All Defendants)**

500.    Allstate re-alleges, re-pleads, and incorporates by reference all paragraphs set forth

above in paragraphs 1 through 360 as if set forth fully in this section.

501.     Zynex, Inc., Zynex Medical, Inc., Thomas Sandgaard, Daniel Moorhead, and Anna

Lucsok (collectively, the "Count X Defendants") were unjustly enriched by (1) billing for DME

products based on false representations that the DME was medically necessary and prescribed by

a licensed and/or qualified healthcare professional; (2) billing for medically unnecessary

replenishment DME supplies that were not prescribed by a physician, unilaterally decided to

replenish Allstate claimants' with a "lifetime" supply of DME supplies without proper medical

qualifications; (3) billing for DME and supplies pursuant to a predetermined treatment protocol;

(4) billing for DME and supplies that were not rendered as represented, if at all; (5) billing grossly

excessive fees for DME and supplies; and (6) fraudulently billing for unbundled DME supplies

with the knowledge that such DME and supplies were not lawfully reimbursable under New York law.

502.    The Count X Defendants' scheme to defraud Allstate was dependent upon a succession of misrepresentations and omissions of material fact related to the corporate Defendants' eligibility for and entitlement to reimbursement under New York law.

503.    The Count X Defendants' misrepresentations and omissions of material fact were conveyed through statements made in the corporate Defendants' records, documents, notes, reports, invoices, prescription forms, health insurance claim forms, letters of medical necessity, and other documents, letters, and/or requests for payment.

504.    The Count X Defendants' statements and representations were false, or required the disclosure of additional facts to render the documents, information, and materials furnished not misleading.

505.    The Count X Defendants knew that Allstate would rely on the corporate Defendants' documents when deciding to pay claims. Consequently, the Count X Defendants intentionally misrepresented or omitted material facts to induce Allstate into making payment on the claims.

506.    When Allstate paid the corporate Defendants, or when Allstate paid a third-party bodily injury claim that was supported by billing submitted, or caused to be submitted, by the Count X Defendants, Allstate reasonably believed that it was legally obligated to make payments on these claims based on the representations made in the records and bills created and submitted by, or on behalf of, the Count X Defendants.

Case No. 1:26-cv-00913-SKC-TPO    Document 22-5    filed 03/26/26    USDC Colorado
Case 1:25-cv-04915-DLI-CHK    Document 1    Filed 09/04/25    Page 111 of 117 PageID #: 111
pg 126 of 132

507.    Each payment that Allstate was caused to make to (or for the benefit of) the corporate Defendants during the course of the scheme constitutes a benefit that the Count X Defendants aggressively sought and voluntarily accepted.

508.    The Count X Defendants caused the corporate Defendants to wrongfully obtain copious payments from Allstate as a direct and proximate result of the unlawful conduct detailed throughout this Complaint. Allstate's injury is the direct and proximate result of the Count X Defendants' unlawful conduct.

509.    The Count X Defendants obtained substantial monetary benefits as the result of their unlawful conduct during the course of this scheme—benefits that were derived, in part, from the monies that Allstate was wrongfully induced to pay on the insurance claims at issue in this Complaint.

510.    Retention of those benefits by any of the Count X Defendants would violate fundamental principles of justice, equity, and good conscience.

## COUNT XI
### DECLARATORY RELIEF UNDER 28 U.S.C. § 2201
### (Against Zynex Medical, Inc.)

511.    Allstate re-alleges, re-pleads, and incorporates by reference all paragraphs set forth above in paragraphs 1 through 360 as if set forth fully in this section.

512.    In view of their (1) billing for DME products based on false representations that the DME was medically necessary and prescribed by a licensed and/or qualified healthcare professional; (2) billing for medically unnecessary replenishment DME supplies that were not prescribed by a physician, unilaterally decided to replenish Allstate claimants' with a "lifetime" supply of DME supplies without proper medical qualifications; (3) billing for DME and supplies pursuant to a predetermined treatment protocol; (4) billing for DME and supplies that were not

Case No. 1:26-cv-00913-SKC-TPO   Document 22-5   filed 03/26/26   USDC Colorado
Case 1:25-cv-04915-DLI-CHK   Document 123 of 138   09/04/25   Page 112 of 117 PageID
#: 112

rendered as represented, if at all; (5) billing grossly excessive fees for DME and supplies; and (6) fraudulently billing for unbundled DME supplies, Zynex Medical, Inc. (the "Count XI Defendant") was, at all relevant times, completely ineligible for reimbursement under state and federal laws, and thus has no standing to submit or receive insurance benefits from Allstate.

513.    The Count XI Defendant continues to submit, or continue to cause to be submitted, claims to Allstate demanding payment. Other claims by the Count XI Defendant remain pending with Allstate.

514.    The Count XI Defendant continues to challenge Allstate's prior claim denials and seeks payment in connection with first party and third party claims.

515.    A justifiable controversy exists between Allstate and the Count XI Defendant because they reject Allstate's ability to deny such claims.

516.    Allstate has no adequate remedy at law.

517.    The Count XI Defendant will continue to bill Allstate absent a declaration by this Court that its activities and billing practices are unlawful, and that Allstate has no obligation to pay the pending, previously denied, and/or future claims submitted by, or on behalf of, the Count XI Defendant.

518.    Accordingly, Allstate requests a judgment according to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202 declaring (a) that the Count XI Defendant has no standing to seek, collect, or retain any payments made by Allstate, and (b) that Allstate has no legal obligation to make any payment on any unpaid or otherwise pending bills that have been submitted to Allstate by, or on behalf of, the Count XI Defendant.

IX.    **DEMAND FOR RELIEF**

WHEREFORE, Allstate respectfully prays that judgment be entered in its favor, as follows:

Case No. 1:26-cv-00912-SKC-TPO    Document 22-5    filed 03/26/26    USDC Colorado
Case 1:25-cv-04915-DLI-CHK    Document 1    Filed 09/04/25    Page 113 of 117 PageID
#: 113

## COUNT I
### VIOLATIONS OF 18 U.S.C. § 1962(c)
### ZYNEX, INC. ENTERPRISE
### (Against Zynex Medical, Inc., Thomas Sandgaard, Daniel Moorhead, and Anna Lucsok)

(i) AWARD Allstate's direct damages to be established at trial;

(ii) AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, interests, costs, and attorneys' fees;

(iii) GRANT injunctive relief enjoining the Count I Defendants from engaging in the wrongful conduct alleged in the Complaint; and

(iv) GRANT all other relief this Court deems just and proper.

## COUNT II
### VIOLATIONS OF 18 U.S.C. § 1962(d)
### ZYNEX, INC. ENTERPRISE
### (Against Zynex Medical, Inc., Thomas Sandgaard, Daniel Moorhead, and Anna Lucsok)

(i) AWARD Allstate's direct damages to be established at trial;

(ii) AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, interests, costs, and attorneys' fees;

(iii) GRANT injunctive relief enjoining the Count II Defendants from engaging in the wrongful conduct alleged in the Complaint; and

(iv) GRANT all other relief this Court deems just and proper.

## COUNT III
### VIOLATIONS OF 18 U.S.C. § 1962(c)
### ZYNEX MEDICAL, INC. ENTERPRISE
### (Against Zynex, Inc., Thomas Sandgaard, Daniel Moorhead, and Anna Lucsok)

(i) AWARD Allstate's direct damages to be established at trial;

(ii) AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, interests, costs, and attorneys' fees;

Case No. 1:26-cv-00913-SKC-TPO    Document 22-5    filed 03/26/26    USDC Colorado
Case 1:25-cv-04915-DLI-CHK    Document 15    Filed 09/04/25    Page 114 of 117 PageID
#: 114

(iii)    GRANT injunctive relief enjoining the Count III Defendants from engaging in the

wrongful conduct alleged in the Complaint; and

(iv)    GRANT all other relief this Court deems just and proper.

## COUNT IV
### VIOLATIONS OF 18 U.S.C. § 1962(d)
### ZYNEX MEDICAL, INC. ENTERPRISE
**(Against Zynex, Inc., Thomas Sandgaard, Daniel Moorhead, and Anna Lucsok)**

(i)    AWARD Allstate's direct damages to be established at trial;

(ii)    AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, interests, costs, and

attorneys' fees;

(iii)    GRANT injunctive relief enjoining the Count IV Defendants from engaging in the

wrongful conduct alleged in the Complaint; and

(iv)    GRANT all other relief this Court deems just and proper.

## COUNT V
### VIOLATIONS OF C.R.S. § 18-17-104(3)
### ZYNEX, INC. ENTERPRISE
**(Against Zynex Medical, Inc., Thomas Sandgaard, Daniel Moorhead, and Anna Lucsok)**

(i)    AWARD Allstate's direct damages to be established at trial;

(ii)    AWARD Allstate treble damages pursuant to C.R.S. § 18-17-106, interests, costs,

and attorneys' fees;

(iii)    GRANT injunctive relief enjoining the Count V Defendants from engaging in the

wrongful conduct alleged in the Complaint; and

(iv)    GRANT all other relief this Court deems just and proper.

## COUNT VI
### VIOLATIONS OF C.R.S. § 18-17-104(4)
### ZYNEX, INC. ENTERPRISE
**(Against Zynex Medical, Inc., Thomas Sandgaard, Daniel Moorhead, and Anna Lucsok)**

(i)    AWARD Allstate's direct damages to be established at trial;

- 114 -

Case No. 1:26-cv-00913-SKC-TPO    Document 22-5    filed 03/26/26    USDC Colorado
Case 1:25-cv-04915-DLI-CHK    Document 1    Filed 09/04/25    Page 115 of 117 PageID
#: 115

(ii)     AWARD Allstate treble damages pursuant to C.R.S. § 18-17-106, interests, costs, and attorneys' fees;

(iii)    GRANT injunctive relief enjoining the Count VI Defendants from engaging in the wrongful conduct alleged in the Complaint; and

(iv)     GRANT all other relief this Court deems just and proper.

## COUNT VII
### VIOLATIONS OF C.R.S. § 18-17-104(3)
### ZYNEX MEDICAL, INC. ENTERPRISE
**(Against Zynex, Inc., Thomas Sandgaard, Daniel Moorhead, and Anna Lucsok)**

(i)      AWARD Allstate's direct damages to be established at trial;

(ii)     AWARD Allstate treble damages pursuant to C.R.S. § 18-17-106, interests, costs, and attorneys' fees;

(iii)    GRANT injunctive relief enjoining the Count VII Defendants from engaging in the wrongful conduct alleged in the Complaint; and

(iv)     GRANT all other relief this Court deems just and proper.

## COUNT VIII
### VIOLATIONS OF C.R.S. § 18-17-104(4)
### ZYNEX MEDICAL, INC. ENTERPRISE
**(Against Zynex, Inc., Thomas Sandgaard, Daniel Moorhead, and Anna Lucsok)**

(i)      AWARD Allstate's direct damages to be established at trial;

(ii)     AWARD Allstate treble damages pursuant to C.R.S. § 18-17-106, interests, costs, and attorneys' fees;

(iii)    GRANT injunctive relief enjoining the Count VIII Defendants from engaging in the wrongful conduct alleged in the Complaint; and

(iv)     GRANT all other relief this Court deems just and proper.

Case No. 1:26-cv-00913-SKC-TPO   Document 22-5   filed 03/26/26   USDC Colorado
Case 1:25-cv-04915-DLI-CHK   Document 1   Filed 09/04/25   Page 116 of 117 PageID
pg 131 of 132
#: 116

## COUNT IX
## NEW YORK COMMON-LAW FRAUD
### (Against All Defendants)

(i)     AWARD Allstate's direct damages in an amount to be established at trial;

(ii)    AWARD Allstate its costs, including, but not limited to, investigative costs incurred

in the detection of the Defendants' illegal conduct; and

(iii)   GRANT all other relief this Court deems just and proper.

## COUNT X
## NEW YORK UNJUST ENRICHMENT
### (Against All Defendants)

(i)     AWARD Allstate's direct damages in an amount to be established at trial; and

(ii)    GRANT all other relief this Court deems just and proper.

## COUNT XI
## DECLARATORY RELIEF UNDER 28 U.S.C. § 2201
### (Against Zynex Medical, Inc.)

(i)     DECLARE that the Count XI Defendant billed for DME services that were provided

in violation of state and federal law;

(ii)    DECLARE that the Count XI Defendant charged for DME and services that are

unlawful;

(iii)   DECLARE that Allstate has no obligation to pay any pending, previously denied,

and/or future claims submitted by, or on behalf of, the Count XI Defendant for such

DME and services; and

(iv)    GRANT all other relief this Court deems just and proper.

## X.    JURY TRIAL DEMAND

The plaintiffs demand a trial by jury on all claims.

[SIGNATURE PAGE FOLLOWS]

- 116 -

Case No. 1:26-cv-00914-SKC-TPO    Document 22-5    filed 03/26/26    USDC Colorado
Case 1:25-cv-04915-DLI-CHK    Document 1-2    Filed 09/04/25    Page 117 of 117 PageID
#: 117

KING, TILDEN, MCETTRICK & BRINK, P.C.

*/s/ Nathan A. Tilden*

_____
Nathan A. Tilden (NT0571)
ntilden@ktmpc.com
Shauna L. Sullivan (SS5624)
ssullivan@ktmpc.com
350 Granite Street, Suite 2204
Braintree, MA 02184
(617) 770-2214

Attorneys for the Plaintiffs,
*Allstate Insurance Company,*
*Allstate Indemnity Company,*
*Allstate County Mutual Insurance Company,*
*Allstate Fire and Casualty Insurance Company,*
*Allstate New Jersey Insurance Company,*
*Allstate New Jersey Property and Casualty Insurance*
*Company,*
*Allstate North American Insurance Company,*
*Allstate Northbrook Indemnity Company, and*
*Allstate Property and Casualty Insurance Company*

Dated: September 4, 2025